## A03A0794. MAYS et al. v. ASKIN.
### (585 SE2d 735)

MILLER, Judge.

Ella Norma Mays, the seller of certain timber, sued John Troupe, the purported purchaser of the timber, and the closing attorney, O. Franklin Askin, Jr. Mays alleged, inter alia, that Askin committed fraud and malpractice, and violated the Georgia Racketeer Influenced and Corrupt Organizations (RICO) Act. Without explaining the basis for doing so, the trial court granted summary judgment to Askin on all counts. After review, because the record indicates the existence of material unresolved issues of disputed fact as to the formation of an attorney-client relationship and contains evidence to support Mays' claim for fraud, we reverse as to those claims only.

The underlying litigation arose after Mays, individually, and as the executrix of the estate of Nathan F. Williams, filed suit against Troupe, the purported purchaser of timber belonging to her father's estate, and Askin, the closing attorney who handled the timber sale. Mays alleged that Askin committed fraud, professional negligence, and violated the RICO Act. Mays subsequently amended her complaint to add claims that Askin knowingly misrepresented the true identity of the purchaser of the timber, the true purchase price, and her obligation to go through with the closing. She also alleged that Askin misrepresented her obligation to pay his attorney fees and the costs of the sale.

Because this appeal results from the grant of summary judgment, we must review the evidence in the light most favorable to the nonmoving party. *Akins v. Couch*, 271 Ga. 276, 277 (518 SE2d 674) (1999). When so viewed, the evidence shows that in April 1997, Troupe contacted Mays, a retired schoolteacher, about buying the timber on an 86-acre tract in Burke County that belonged to the estate of her father. Mays told Troupe that she might sell the timber in the fall. Troupe met with Mays on at least two other occasions about selling the timber. Mays testified that on May 16, when she signed a timber agreement, it did not have the price filled in. Mays testified that she understood that it was an agreement to start the process of pricing the timber and that potential buyers would need to

inspect the timber first. She testified that when she told Troupe, "well, maybe I should carry this by to see my lawyer," Troupe said, "this was just an intent." It is undisputed that before this occasion, Mays had no prior experience in selling timber.

On May 29, 1997, at the direction of an employee at Askin's law office, Mays went to Askin's office. Mays testified that she thought she was going there to obtain information about the prices being offered for the timber. Despite having reservations about proceeding, she signed the documents.

Prior to the closing, Hentz Forest Products (Hentz) had issued a check payable to "Fran Askin" in the amount of $78,500. The check denoted the payment as for the "Williams Tract (Waynesboro)." Askin prepared all of the closing documents which indicated that Troupe, not Hentz, was the purchaser. Mays testified Askin reviewed the settlement statement with her, but she felt "rushed through the closing." Mays testified that when she asked Askin if she could "carry these documents" with her "to study" them, Askin discouraged her from doing so. At the time, only she and Askin were present. Askin testified that he told Mays that Troupe was his client. Askin admitted that before the closing, he knew that Sidney Shepard represented the estate. Although Askin testified that he thought that he had spoken with Shepard prior to the closing, Shepard testified otherwise. Shepard, the estate's attorney since 1983, testified that he did not recall speaking with Askin about the timber, nothing in his file indicated any such discussion, and he did not learn about the sale until 2002.

A HUD-1 settlement statement and addendum, prepared by Askin, plainly listed Troupe as the buyer and showed that he paid $63,000 for the timber. Askin charged Mays $2,732 that included a $32 fee for "document preparation," $1,500 in attorney fees to Askin, and $1,200 "to reimburse J. Troupe poc survey." In addition, Mays was required to pay Burke County $1,071 in timber taxes. Askin testified that when Mays asked him about deducting executor fees, Askin told her to see Shepard. Mays paid all of the closing costs and Troupe paid none. Mays testified that when she had asked Askin questions about paying the charges, "he just says this was charged to me for selling the timber." Despite feeling "kind of skeptical," Mays executed the closing documents and accepted a check payable to her individually and on behalf of the estate in the amount of $59,197.

Troupe did not attend the closing with Mays, but on the same day, Askin closed a transaction between Troupe and Hentz. When Troupe assigned his interest in the timber to Hentz, Askin represented Troupe and Askin charged him $500 in attorney fees. Troupe testified that he never told Mays that he was going to resell it to Hentz or that he worked for Hentz.

Mays deposited the check into her father's estate. In September 2001, more than four years after the closing date, Mays filed this suit. In support of her claims, Mays's expert, James E. Carter, testified that "[w]hen a lawyer charges a fee to a client and provides other services, an attorney-client relationship is created. Once an attorney-client relationship was created between [Mays] and [Askin], he then had an obligation to disclose to [Mays] the entire amount of funds being paid by Hentz Forest Products for the purchase of the timber." Carter further testified that the failure of an attorney to "disclose to the client the full amount of money paid for the timber through the attorney's escrow account" violates the standard of care in Georgia.

On the other hand, Askin offered expert testimony to show that an attorney-client relationship did not exist. Barney Dunstan, his expert, testified that in his opinion, no attorney-client relationship was established between Askin and Mays. Dunstan testified that Askin "was merely collecting proceeds, making the disbursements, and preparing the paper trail to evidence a deal that she had already made." He testified that in his opinion, merely explaining the entries on a closing statement does not constitute legal advice. Dunstan felt that the amounts charged to Mays were fair because Askin had to do corrective work on the title.

Notwithstanding this conflicting testimony and other evidence, the trial court awarded summary judgment to Askin. Mays appeals.

1. Mays contends that the trial court erred in awarding summary judgment to Askin on her claim for legal malpractice.

The existence of an attorney-client relationship is the threshold question in a legal malpractice case. *Guillebeau v. Jenkins*, 182 Ga. App. 225, 229 (1) (355 SE2d 453) (1987). Generally, the payment of a fee is an important factor in determining the existence of an attorney-client relationship. See *Home Ins. Co. v. Wynn*, 229 Ga. App. 220, 224-225 (493 SE2d 622) (1997). An attorney-client relationship may be created expressly by written contract or inferred from the parties' conduct. *Huddleston v. State*, 259 Ga. 45, 46 (1) (376 SE2d 683) (1989). Although contractual formalities are not essential to the creation of such relationships, the fundamental question is whether the professional advice or assistance of an attorney has been both sought and received in a legal matter. *Newberry v. Cotton States Mut. Ins. Co.*, 242 Ga. App. 784, 785 (1) (531 SE2d 362) (2000). "All that is necessary is a 'reasonable belief' on the part of the would-be client that he or she [is] being represented by [an] attorney." *Calhoun v. Tapley*, 196 Ga. App. 318, 319 (395 SE2d 848) (1990). In *Calhoun*, an attorney-client relationship was created, even without the payment of a fee, where the attorney freely discussed the case with the client, answered all of the client's questions, never told the client that he

could not discuss the matter because he did not represent her, and never advised her to retain another lawyer. Id. at 319.

Here, Frank Beltran, one of Mays's experts, testified that in his opinion, an attorney-client relationship between Mays and Askin had been formed. In reaching that determination, Beltran relied upon the pre-January 1, 2000 bar standards and rules and based his opinion on a "combination of things." Beltran listed the following factors: Mays paid his fee, met with him, and sought his legal advice, he explained every item on the statement, and "she said he gave advice."

In addition, Beltran pointed out that Askin testified that he thought that "Mr. Shepard represented her for the closing, or represented her in this deal." Beltran explained that if Askin believed that Shepard was representing Mays, then "he needed to get written permission from Mr. Shepard to talk to Ms. Mays." Alternatively, according to Beltran, if Mays was not being represented by Shepard, then Askin needed to inform Mays that he did not represent her and that she had a right to get another lawyer, and to advise her that he represented Troupe and "that his undivided loyalty was to Mr. Troupe only." Beltran added, "And there is nothing in the record anywhere that he did that." Beltran also testified that had Askin represented Troupe and Mays jointly, "he needed to get written consent or provide a written disclosure to Ms. Mays, and he has admitted he has not provided anything in writing."

Mays testified that when she questioned Askin as to why she was having to pay the attorney fees, the survey costs, and other charges, he had explained to her that those expenses were part of her agreement with Troupe. In other words, it appears that Askin may have provided a legal opinion about the terms in the timber agreement. Yet, the timber agreement is silent as to attorney fees, survey costs, or any other expenses. Also, Mays testified that "he gave me advice." Since the record contains evidence to support a finding that an attorney-client relationship was formed, a jury must decide that issue. See Guillebeau, supra.

Although Askin asserts that this claim is untimely, we disagree. If Askin intentionally concealed the identity of the buyer and the actual purchase price from her and Mays did not discover the true facts until the summer of 2001, then suit would not be foreclosed because the statute of limitation in malpractice cases is tolled when the defendant intentionally conceals information that he ought to reveal and thereby deters the plaintiff from filing suit. See Hunter, Maclean, Exley & Dunn v. Frame, 269 Ga. 844, 850 (2) (507 SE2d 411) (1998).

2. Mays contends that material issues of disputed fact precluded summary judgment on her fraud claim. We agree.

Mays testified that when she signed "some paper" it did not have

the purchase price filled in. She testified that she thought by signing the "paper" she was giving Troupe a first option if she decided to sell the timber. She testified that Troupe called it "a contract with intent to sell." Mays testified that she did not understand that by signing the document she had agreed to sell the timber. She explained that she thought the paper was to allow Troupe to be "an agent to look at the property and to give me a figure." And, while the timber agreement states, "Seller acknowledges $____ receipt of earnest money as further consideration for this agreement," Troupe never gave a deposit to Mays. Assuming that Mays's testimony is true, the timber agreement may not have been enforceable, since it lacked all essential terms and conditions at the time that Mays signed it. If, in fact, the timber agreement was not a binding contract, then Askin may have misled Mays about its enforceability as well as what its terms required.

Askin testified that he told Mays that she was paying attorney fees "per yours and John's agreement." But, the record fails to support Askin's testimony that "John and Ms. Mays negotiated every facet of this transaction." Troupe denied ever telling Mays that she would have to pay Askin's attorney fees or even discussing the issue with her. So, Askin may have misrepresented to Mays her obligation to pay $1,500 to him in attorney fees. Similarly, questions remain about Mays's liability for the timber tax. Askin admitted that the timber tax is "normally due as the timber is cut," but Mays, not Hentz, was required to pay the timber tax to Burke County. Mays testified that when she asked Askin about the timber taxes, "if I had to pay anything," he had told her "they were going to pay it." But, when Askin was asked during his deposition, whether Hentz paid the timber tax within five days of the Troupe/Hentz closing, Askin responded, "Hentz Forest Products was the buyer. They're responsible for the tax so I don't know." Yet, in the Mays/Troupe transaction, Troupe, the ostensible buyer, was not responsible for the tax.

Also, by law, "[w]ithout an expressed stipulation to the contrary, a purchaser must pay the costs of the conveyance." OCGA § 44-5-47. But here, apparently an express stipulation requiring Mays to pay the costs of the conveyance did not exist. Yet, pursuant to the closing documents that Askin prepared, Troupe paid nothing while Mays paid the costs of conveyance and much more.

Other evidence shows that Askin wrote checks for $500 and $700 from his escrow account to Bobby Lopez to survey the estate's property, *before* Mays signed the timber agreement. From the disbursement statement it does not appear that Askin disbursed all of the funds from the Troupe/Hentz closing. From the proceeds, Askin wrote a check to Cheryl Troupe for $8,500 and another to Troupe for $2,250. Troupe testified that he previously had left money with

Askin partly because "the Internal Revenue Service had me in a mess." Askin's Landtech 86 Receipt/Check Disbursement Statement indicates that Askin wrote checks to Troupe but then later voided them. A document titled "Report of Timber Sale or Harvest" prepared by Askin and submitted to Burke County stated that John Troupe was the purchaser but gave Askin's address instead of Troupe's and it had postdated the date of the sale to June 3, 1997.

In sum, the record contains evidence that Askin received $15,500 over and above the amount that Askin disclosed to Mays, and may have misrepresented or concealed the identity of the buyer and the true purchase price. In light of this and other evidence, a jury must decide whether Askin made misrepresentations to Mays about her obligation to pay his attorney fees, the timber tax, the survey costs, and other expenses. Because the record establishes the existence of material issues of disputed fact on the issue of fraud, we believe that a jury must resolve this claim.

Notwithstanding the argument to the contrary, the claim is not time-barred. The statute of limitation for fraud is four years. OCGA § 9-3-31. But, when actual fraud is the gravamen of an action, the statute of limitation is tolled "until the fraud is discovered or should have been discovered, unless excused." *Shipman v. Horizon Corp.*, 245 Ga. 808, 809 (267 SE2d 244) (1980). Here, the record contains evidence that Askin concealed or failed to disclose certain information to Mays including the identity of the real purchaser, the actual purchase price, and the participation of Hentz. Mays had no reason to believe that Troupe was not the buyer since all of the closing documents that Askin prepared showed Troupe as paying $63,000 to the estate to buy the timber. Even the timber tax document prepared and filed by Askin in Burke County reflected Troupe as purchaser. Therefore, this claim is not untimely. See id.

3. Mays asserts that the trial court erred in granting summary judgment on her civil RICO claim. We disagree.

For an individual plaintiff to recover under RICO, she must establish injuries that flow from the commission of a "pattern of racketeering activity" meaning engaging in at least two predicate acts of racketeering activity. OCGA § 16-14-3 (8). The plaintiff must establish a causal connection between the injury alleged and the predicate acts. *Longino v. Bank of Ellijay*, 228 Ga. App. 37, 41 (491 SE2d 81) (1997).

In this case, Mays neither properly alleged nor presented evidence of a "pattern of racketeering." In the absence of evidence of two predicate acts, we find that Askin was entitled to judgment as a matter of law on this claim. See *Roth v. Connor*, 235 Ga. App. 866, 872 (4) (510 SE2d 550) (1999).

*Judgment affirmed in part and reversed in part. Ruffin, P. J., and Barnes, J., concur. Smith, C. J., disqualified.*

DECIDED JULY 16, 2003 — 

*Bell & Bell, David B. Bell, Sharon B. Enoch*, for appellants.

*Oliver, Maner & Gray, Patrick T. O'Connor, Paul H. Threlkeld, Tucker, Everitt, Long, Brewton & Lanier, Thomas W. Tucker*, for appellee.