## A06A0889. CLEVELAND CAMPERS, INC. et al. v. R. THAD McCORMACK, P.C. et al.
(635 SE2d 274)

MIKELL, Judge.

Cleveland Campers, Inc. ("CCI"), and its sole owners, H. V. and Wilda Rohr, filed the underlying action asserting claims of legal malpractice and breach of fiduciary duty against closing attorney Raymond T. McCormack and his law firm, R. Thad McCormack, P.C., arising out of the sale of CCI to Marilyn Ballard and Happy Time RV Sales & Service ("Happy Time"). The trial court granted McCormack's motion for summary judgment, finding that no attorney-client relationship existed between the Rohrs and McCormack. The Rohrs appeal. For reasons explained below, we affirm.

1. Prior to reaching the merits of the appeal, we find it necessary to address the litigants' failure to follow this Court's rules. Court of Appeals Rule 25 (a) (1) provides, in pertinent part, that "[r]ecord and transcript citations must be to the volume or part of the record or transcript and the page numbers that appear on the appellate records or transcript *as sent from the court below.*" (Emphasis supplied.) In this case, however, neither the Rohrs nor McCormack reference the volume of the record *as forwarded to this Court*, but merely reference the record, i.e., "Affidavit of Marilyn Ballard," or the pages of a deposition transcript, as prepared by the transcribing court reporter. In one instance, appellants refer to the deposition of H. V. Rohr, a copy of which is not even included in the record. This practice is entirely inadequate and nominally helpful as it requires the Court to cull the record on behalf of the parties, something we decline to do. Accordingly, if we have omitted any facts or failed to locate some evidence in the record, the responsibility rests with counsel.

2. In their sole enumeration of error, the Rohrs contend that the trial court erred in granting summary judgment to McCormack because material issues of fact remain about whether McCormack's conduct created an attorney-client relationship. We disagree.

> To prevail on summary judgment, the moving party must show that no genuine issues of material fact remain to be tried and that the undisputed facts, viewed in the light most favorable to the nonmovant, warrant judgment as a matter of law. On summary judgment, we must construe the evidence and all reasonable inferences and conclusions that may be drawn from it most favorably to the nonmovant.[1]

---

[1] (Footnotes omitted.) *Dyer v. Honea*, 252 Ga. App. 735, 736 (1) (557 SE2d 20) (2001).

So viewed, the evidence shows that the Rohrs started CCI in 1985, in Cleveland, Georgia. In early 2000, the Rohrs began negotiations for the sale of CCI to Ballard, whom they had met through a CCI employee. The Rohrs first met with Ballard and her husband at Ballard's home in April 2000, and then again for dinner at a restaurant in Clermont, where, according to Ballard, the parties agreed to conduct the transaction "amicably." Regarding that second meeting, Ballard testified as follows:

> [We discussed] that we might as well do it amicably, that one attorney could prepare the documents and that he [(McCormack)] was our attorney, and I even said that to Wilda at the time. "He's our attorney, but he's willing to prepare the documents, I know. Think about it. If you want us to do that, we can. It will save you the cost of an attorney." She came back at some point, maybe the next day or — and said, "Well, that sounds good. I think we'd like to do that."

Shortly after this second meeting, Ballard met with McCormack and told him that she was thinking of purchasing CCI. McCormack, a Hall County attorney who had known Ballard and her husband for over ten years and had performed estate planning services for them, recommended that Ballard hire accountant Donald Bloom to perform the due diligence work on CCI. Ballard agreed, and in May 2000, the Rohrs and Ballard met with Bloom to review CCI's financial statements. Bloom subsequently drafted a letter of intent for the sale of CCI to William and Marilyn Ballard for $1,700,000, which the parties executed on June 7, 2000. Sometime after the letter of intent was executed, the parties met with Bloom and McCormack at McCormack's office to discuss inventory issues related to CCI. At that meeting, Ballard introduced McCormack to the Rohrs as "our attorney in this matter."

In early October 2000, Wilda Rohr became aware that McCormack was drafting an "Agreement for the Purchase and Sale of Assets of [CCI]" by Ballard and Happy Time (the "Purchase Agreement"). Though Wilda Rohr had never met with McCormack about drafting the Purchase Agreement, on October 8, 2000, the Rohrs met with the Ballards and "agreed to use . . . McCormack as our attorney for the entire process." McCormack was not present at this meeting. When asked if there had been any conversations between the Rohrs and McCormack in which McCormack indicated that he was representing the Rohrs in the transaction, Wilda Rohr testified as follows:

> No, but there's never been any conversation whereby he indicated that he was not representing us. . . . We just

assumed that we were all using the same attorney because that's what we agreed to do and . . . Ballard said, I will handle everything with . . . McCormack.

McCormack, who has represented either a buyer or seller of a business in approximately 80 transactions, believed that the Rohrs were represented by their neighbor, attorney Newsom Cummings. However, McCormack found it unusual that Cummings never contacted him about the transaction. McCormack never told the Rohrs that he was representing them in the transaction, or stated that he was representing only Ballard.

The Purchase Agreement was executed on October 13, 2000, by H. V. Rohr, as president of CCI, and Ballard, as president of Happy Time. Ballard paid McCormack approximately $6,800 in attorney fees for his services. The Rohrs did not pay any attorney fees to McCormack; however, after the closing, they asked him to dissolve their corporation. After McCormack dissolved the corporation, he received a call from the Rohrs' accountant asking that he revive the corporation, which he did. The Rohrs paid McCormack for these services.

Bloom averred in an affidavit that McCormack represented Ballard in the transaction and never gave any indication that he was representing the Rohrs. Ballard averred in her affidavit that Cummings represented the Rohrs in the transaction; that the Rohrs stated several times that they were taking or had taken documents to Cummings for his review; and that the Rohrs never reimbursed her for any of McCormack's legal fees related to the transaction. H. V. Rohr averred that sometime after Ballard introduced McCormack as "our attorney," he came to McCormack's office to drop off some papers for Bloom when he ran into McCormack in the hall. McCormack told Rohr that Ballard could not come up with the down payment and that some creative financing might need to be done. Rohr further averred that McCormack never indicated that he was representing only Ballard and that the Rohrs should hire their own attorney. Had H. V. Rohr known that McCormack was not representing his interests, he would have hired another attorney. Wilda Rohr similarly averred that McCormack never indicated that he was representing only Ballard and that the Rohrs should hire their own attorney, and never obtained written authorization from another attorney to speak with the Rohrs about the transaction. She also averred that in January 2001, Ballard requested that the Rohrs pay half of McCormack's legal fees related to the transaction. Wilda agreed, provided Ballard pay $8,000 she owed to the Rohrs.

The Rohrs now allege that Happy Time has defaulted on its obligations to them, and that because of alleged deficiencies in the

closing documents prepared by McCormack they are unable to collect from Ballard and/or take further action against her. The Rohrs contend they had an attorney-client relationship with McCormack and that McCormack breached his duty to them by failing to protect their interests. The trial court disagreed, finding no evidence of an attorney-client relationship between the Rohrs and McCormack. Specifically, the trial court noted that Ballard introduced McCormack as her and her husband's attorney and that McCormack never made any statement which indicated that he or his firm were representing the Rohrs.

"It is generally held that an attorney-client relationship must be demonstrated before a plaintiff may recover in a legal malpractice suit. This is essential in establishing the element of duty that is necessary to every lawsuit based upon a theory of negligence."[2] Though an attorney-client relationship generally is a matter of express contract, it may be implied from the conduct of the parties.[3] "[T]he employment is sufficiently established when it is shown that the advice or assistance of the attorney is sought and received in matters pertinent to his profession."[4] Moreover,

> [w]hile the payment of a fee is relevant to the inquiry and may in some circumstances be controlling, an attorney-client relationship may be found to exist where no fee is paid[,] and the payment of a fee does not necessarily demonstrate the existence of the relationship. All that is necessary is a "reasonable belief" on the part of the would-be client that he or she was being represented by the attorney. A reasonable belief is one which is reasonably induced by representations or conduct on the part of the attorney.[5]

In this case, as in *Guillebeau* and *Richards*, there is no evidence of an attorney-client relationship between the Rohrs and McCormack. There is no evidence that the Rohrs sought legal advice or assistance from McCormack or that McCormack offered any legal advice. Nor did the Rohrs ever communicate to McCormack that they would rely on him for legal advice related to the transaction. Rather, the evidence shows that the Rohrs only advised Ballard that they would rely on McCormack for legal advice related to the transaction.

---

[2] (Punctuation omitted.) *Richard v. David*, 212 Ga. App. 661-662 (1) (442 SE2d 459) (1994), citing *Guillebeau v. Jenkins*, 182 Ga. App. 225, 229 (1) (355 SE2d 453) (1987).

[3] See *Guillebeau*, supra.

[4] (Citation and punctuation omitted.) Id. See also *Richard*, supra at 662 (1).

[5] (Punctuation omitted.) *Calhoun v. Tapley*, 196 Ga. App. 318, 319 (395 SE2d 848) (1990), citing *Guillebeau*, supra at 230-231 (1).

Moreover, except for one meeting to discuss inventory issues and one chance meeting in the hallway, the Rohrs had no contact with McCormack until the closing. Wilda Rohr did not even know McCormack was drafting the Purchase Agreement until five days before the closing and "had no history of any past dealings with [him] or his firm whatsoever."[6] Additionally, the Rohrs did not pay any legal fees. We will not assume an attorney-client relationship between the Rohrs and McCormack where evidence of such a relationship rests entirely on conversations between Ballard and the Rohrs, none of which included McCormack. As we noted in *Guillebeau*, "[a]n attorney-client relationship cannot be created unilaterally in the mind of a would-be client; a reasonable belief is required."[7] Though the Rohrs may have believed McCormack represented them, in light of the evidence, that belief was not reasonable.

We disagree with the Rohrs that this case is controlled by *Calhoun*,[8] *Mays*,[9] or *Dyer*.[10] In *Calhoun*, the defendant attorney represented the plaintiff's acquaintance in a wraparound real estate transaction. Five months after the transaction, the residence was destroyed by fire and the plaintiff sought to recover insurance proceeds. The plaintiff was advised that the defendant attorney was handling the matter. When the insurance company denied the claim and then obtained summary judgment in a later lawsuit on the ground that the contractual limitation period specified in the policy had expired, the plaintiff sued the defendant attorney for legal malpractice.[11] We reversed the grant of summary judgment to the defendant attorney finding that a genuine issue of material fact existed as to whether an attorney-client relationship existed between the plaintiff and the defendant attorney.[12] We based our decision on the following factors: (1) the defendant attorney discussed the plaintiff's case with her, answered her questions, and assured her that the insurance company was processing her claim and that he expected to receive proceeds from her insurance policy shortly; (2) when the defendant attorney did not receive the insurance proceeds he further advised the plaintiff that he was filing suit on her behalf; (3) when the plaintiff lost that case, the defendant attorney told the plaintiff that it was his mistake and his fault and that he did not blame her if she sued him; and (4) another affiant averred that when he called the

---

[6] *Legacy Homes v. Cole*, 205 Ga. App. 34, 35 (421 SE2d 127) (1992).

[7] (Citations omitted.) *Guillebeau*, supra at 231 (1).

[8] Supra.

[9] *Mays v. Askin*, 262 Ga. App. 417 (585 SE2d 735) (2003).

[10] Supra.

[11] *Calhoun*, supra at 318.

[12] Id. at 320.

defendant attorney to ask permission to talk to his client, i.e., the plaintiff, the defendant attorney replied that he had no objection to the affiant talking with the plaintiff.[13]

In *Mays*, we reversed the grant of summary judgment to the defendant attorney in an action for legal malpractice finding that the defendant attorney may have provided a legal opinion to the plaintiff about the terms of a sales contract; that the plaintiff paid the defendant attorney fees; that the plaintiff met with the defendant and sought legal advice from him; and that the defendant offered legal advice and explained every item on the closing statement.[14] Additionally, we found no evidence that the defendant attorney either informed the plaintiff at the closing that he did not represent her or advised her " 'that his undivided loyalty was to [the buyer] only.' "[15]

In *Dyer*, we affirmed the denial of the defendant attorney's motion for summary judgment on the plaintiff's legal malpractice claim, finding that a genuine issue of material fact existed as to whether the defendant attorney offered legal representation to the plaintiff.[16] In that case, there was evidence that the defendant attorney told the plaintiff in a telephone call that he could prepare a sales contract; that he would represent the plaintiff; and that the plaintiff would be responsible for closing costs of $750.[17]

The Rohrs are correct that this case is similar to *Mays* because there is no evidence that McCormack either informed the Rohrs at the closing that he did not represent them or advised them that his undivided loyalty was to the Ballards. However, this failure is insufficient to support an attorney-client relationship between the Rohrs and McCormack absent any evidence that the Rohrs sought legal advice or assistance from McCormack or that McCormack offered any legal advice, factors that were overwhelmingly present in *Calhoun*, *Mays*, and *Askins*.

The Rohrs further argue that the following omissions support their claim that an attorney-client relationship existed: (1) McCormack never obtained written authorization from another attorney to speak with the Rohrs; (2) McCormack was never contacted by any attorney claiming to represent the Rohrs; (3) McCormack never received from the Rohrs, or any attorney claiming to represent them,

---

[13] Id. at 319-320.

[14] *Mays*, supra at 420 (1).

[15] Id. Compare *Moore v. Harris*, 188 Ga. App. 251, 252-253 (372 SE2d 654) (1988) (affirming grant of summary judgment to defendant attorney in legal malpractice action because the defendant attorney made it clear to the plaintiff buyers that he represented only the sellers).

[16] *Dyer*, supra at 742-743 (4).

[17] Id. at 742 (4).

any suggested changes to the Purchase Agreement; and (4) McCormack did not include language in the Purchase Agreement indicating that he represented only Ballard. On the contrary, we are unwilling to infer an attorney-client relationship based on mere omissions. As there is no evidence in the record that McCormack did or said anything that could be construed as an offer to represent the Rohrs or do anything on their behalf, we conclude that the trial court correctly determined that no attorney-client relationship existed between the Rohrs and McCormack.

*Judgment affirmed. Blackburn, P. J., and Adams, J., concur.*

DECIDED AUGUST 3, 2006.

*Hassett, Cohen, Goldstein, Port & Gottlieb, Lee S. Goldstein,* for appellants.

*Elrod & Elrod, Christopher D. Elrod,* for appellees.