**FOURTH DIVISION**
**DILLARD, P. J.,**
**MERCIER, J., and SENIOR JUDGE FULLER**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

**September 10, 2025**

# In the Court of Appeals of Georgia

A25A0779. ROYAL TEXAS, LLC v. CAJUN GLOBAL, LLC et al.

DILLARD, Presiding Judge.

The attorney-client privilege is a cornerstone of the rule of law with roots tracing back to the Roman Empire.[1] This ancient privilege protects confidential and frank communications between an attorney and client and promotes the civilized resolution of disputes. But the privilege is not absolute, not always applicable, and has exceptions. This case presents us with an unresolved question about the scope of the privilege: Does it apply to protect otherwise confidential communications between in-

---

[1] *See* 1 MCCORMICK ON EVIDENCE § 87 (9th ed. 2025) (noting that "[t]he notion that the loyalty owed by the lawyer to a client disables the lawyer from being a witness in the client's case is deep-rooted in Roman law"); *see also* Ronald L. Carlson & Michael Scott Carlson, CARLSON ON EVIDENCE, p. 277 (Ed. 2025) (noting that "[t]he Attorney-Client Privilege rests upon the need for confidential legal advice and . . . has a historic tradition . . . .").

house counsel and a corporation when that counsel does not hold an active law license? The short answer is: Yes—under certain circumstances. These communications are protected by the attorney-client privilege if the "client" company had a reasonable belief that its in-house counsel was authorized to practice law.

Here, Royal Texas, LLC, appeals from the trial court's judgment concluding that communications between Cajun Global, LLC,[2] and its in-house counsel and chief legal officer, Craig Prusher, were protected by attorney–client privilege. The court did so even though Prusher held an inactive Massachusetts bar license during the relevant time period. Royal Texas argues the court erred by (1) concluding Prusher was an attorney authorized to practice under Georgia law, (2) applying a "reasonable belief" test to determine whether the privilege applied without requiring minimal due diligence, and (3) accepting Cajun Global's self-serving statements in support of its "reasonable belief," even if such a test were appropriate. For the following reasons, we affirm.[3]

---

[2] The appellees—referred to collectively as "Cajun Global"—are Cajun Global, LLC, d/b/a Church's Chicken; Cajun Operating, LLC; and High Bluff Capital Partners, LLC.

[3] Oral argument was held on April 8, 2025, and is archived on the Court's website. *See* Court of Appeals of the State of Georgia, Oral Argument, Case No.

These proceedings began when, on March 31, 2022, Royal Texas filed suit against Cajun Global for breach of contract, libel and slander, civil conspiracy, and tortious interference, and also sought an accounting and attorney fees. The lawsuit concerned Cajun Global's termination of restaurant-franchise agreements between the parties. And during the litigation, a discovery dispute arose. More precisely, Royal Texas sought to compel production of documents that Cajun Global withheld on the basis of attorney–client privilege and attorney work product. Royal Texas argued the attorney–client privilege did not apply to these documents because Cajun Global's in-house counsel, Prusher, was not licensed in any jurisdiction and had not maintained an active bar license for nearly thirty years.

Prusher held a bar license from Massachusetts, which he obtained in 1988, and which went inactive in 1993 (when he no longer actively practiced in the commonwealth). Prusher joined Cajun Global in 2012 to serve as in-house counsel—first as general counsel, and then as chief legal officer. When he joined the company, Prusher did not disclose that his Massachusetts bar license was inactive; and as one would expect, Cajun Global's chief executive and chief financial

A25A0779 (April 8, 2025), *available at* https://vimeo.com/1073664698.

officers—who were unaware that Prusher's license was inactive—sought and received legal advice from him.

The superior court appointed a special master in February 2024, who was tasked with providing recommendations on pending discovery disputes—including the one before us. And on March 28, 2024, the special master concluded the attorney–client privilege applied because Cajun Global had a "reasonable belief" Prusher was authorized to act as its attorney.[4] In reaching this conclusion, the special master assessed the law in other jurisdictions because Georgia had no precedent directly on point.

After Royal Texas objected to the special master's recommendation, the superior court affirmed and adopted the ruling, also concluding the issue was one of first impression in Georgia. In doing so, the court determined Prusher and Cajun Global maintained an attorney–client relationship despite Prusher's lack of an active bar license. But the court also found that if the "reasonable belief" test *did* apply, the evidence—which it reviewed *de novo*—supported such a belief by Cajun Global. The

---

[4] The special master did *not* apply the privilege to some communications that it concluded fell outside the attorney–client privilege; but those communications are not at issue on appeal.

court then issued a certificate of immediate review, and we granted Royal Texas's application for interlocutory appeal. This appeal follows.[5]

Although Royal Texas argues the trial court erred in concluding that Prusher was an attorney authorized to practice under Georgia law, we need not reach this issue. Instead, we will assume—for the sake of argument—that Prusher was not authorized to practice law in Georgia during the relevant time period. Even so, we reject Royal Texas's second and third enumerations of error—that the trial court erred by applying the "reasonable belief" test and finding Cajun Global had such a belief as to Prusher's status.

1. Royal Texas contends the trial court erred by applying a "reasonable belief" test to determine whether the attorney–client privilege applies to communications with an in-house counsel who does not hold an active bar license. We disagree.

---

[5] This case encompassed a record of 30 electronic volumes, containing more than 7,000 pages. But in contravention of our rules, both parties used the stamped page numbers rather than PDF page numbers when referring to the record; and neither party included volume numbers. We take this opportunity to remind counsel for both parties—and the bar at large—that the rules of this Court specify that reference to electronic records "should be indicated *by the volume number* of the electronic record *and the PDF page number* within that volume (Vol. Number – PDF Page Number; for example, V2-46)." CT. APP. R. 25 (d) (2) (emphasis supplied).

In Georgia, the attorney-client privilege "generally applies in the context of communications between in-house corporate counsel and the corporation's management and employees."[6] This privilege is "the oldest of the privileges for confidential communications known to the common law."[7] And the purpose of the attorney–client privilege is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the

---

[6] *St. Simons Waterfront, LLC v. Hunter, Maclean, Exley & Dunn, P.C.*, 293 Ga. 419, 422 (1) (746 SE2d 98) (2013); *see Southern Guar. Ins. Co. v. Ash*, 192 Ga. App. 24, 27 (383 SE2d 579) (1989) (noting that "once an attorney-client relationship has been duly established between an attorney and his corporate client . . . [,] the legal advice confidentially communicated to the authorized agents of the client is by statute protected from discovery" (emphasis omitted)); *Marriott Corp. v. American Acad. of Psychotherapists*, 157 Ga. App. 497 (3) (277 SE2d 785) (1981) (recognizing privilege for communications from a corporation's employee to its in-house counsel); *see also Upjohn Co. v. United States*, 449 U.S. 383, 389-390 (II) (101 SCt 677, 66 LE2d 584) (1981) (recognizing privilege for in-house corporate counsel under federal common law).

[7] *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 169 (II) (131 SCt 2313, 180 LE2d 187) (2011); *accord Upjohn Co.*, 449 U.S. at 389 (II); *see also Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 108 (II) (B) (130 SCt 599, 175 LE2d 458) (2009) (readily acknowledging "the importance of the attorney-client privilege, which is one of the oldest recognized privileges for confidential communications" (citation and punctuation omitted)).

observance of law and administration of justice."[8] Indeed, the attorney–client privilege "recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client."[9]

And while the attorney–client privilege generally only protects communications with licensed attorneys, many courts have concluded that a reasonable-belief exception should apply when a client makes an excusable mistake about an attorney's license status.[10] Significantly, we already apply a reasonable

---

[8] *St. Simons Waterfront*, 293 Ga. at 422 (1) (punctuation omitted); *see also Jicarilla Apache Nation*, 564 U.S. at 169 (II) (noting that the attorney–client privilege's aim is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice"); *Mohawk Indus.*, 558 U.S. at 108 (II) (B) (noting that "[b]y assuring confidentiality, the privilege encourages clients to make 'full and frank' disclosures to their attorneys, who are then better able to provide candid advice and effective representation").

[9] *St. Simons Waterfront*, 293 Ga. at 422 (1) (punctuation omitted); *see* OCGA § 24-5-501 (a) (2) (protecting attorney–client communications).

[10] *See Beyer Laser Ctr., LLC v. Polomsky*, 2019 WL 5549161, at *8 n.9 (D. Colo. Oct. 25, 2019) (noting that "[t]he test for whether attorney–client privilege applies remains whether the client had a reasonable belief that it was communicating with an attorney" (punctuation and citation omitted)); *John Ernest Lucken Revocable Tr. v. Heritage Bankshares Grp., Inc.*, No. 16-CV-4005-MWB, 2017 WL 627223, at *1-2 (III) (N.D. Iowa Feb. 15, 2017) (acknowledging that "[t]he general rule that attorney–client

7

privilege cannot attach where the communication[s] were not made with a member of the bar, with the exception where the person asserting the privilege had a reasonable but mistaken belief that the person with whom they were communicating was in fact a licensed attorney," and adopting a "reasonable belief" exception (punctuation omitted)); *Anwar v. Fairfield Greenwich Ltd.*, 982 FSupp2d 260, 265 (II) (B) (S.D.N.Y. 2013) ("[N]otwithstanding the general rule that the attorney[–]client privilege applies only to licensed attorneys, courts have found communications with non-attorneys to be privileged in limited circumstances in which the client reasonably believes that the person to whom the communications were made was in fact an attorney." (punctuation omitted)); *Gucci Am., Inc. v. Guess?, Inc.*, 2011 WL 9375, at \*5 (IV) (B) (S.D.N.Y. Jan. 3, 2011) (noting that "the reasonable belief exception is well established," and that "[a] number of courts have sustained invocation of the privilege even when the communications were not made with a member of the bar, if the client reasonably believed that it was communicating with an attorney"); *In re Grand Jury Subpoena Duces Tecum*, 112 F3d 910, 924 (8th Cir. 1997) (discussing approaches of other courts in applying the reasonable-belief standard where an attorney–client relationship did not exist, but where there were reasonable mistakes of fact by clients that the relationship did exist and communications were covered by attorney–client privilege); *United States v. Rivera*, 837 FSupp 565, 568 n.1 (S.D.N.Y. 1993) (noting that "[i]t is common ground among the parties that the attorney–client privilege attaches to confidential communications made to an individual in the genuine, but mistaken, belief that he is an attorney"); *United States v. Mullen & Co.*, 776 FSupp 620, 621 (D. Mass. 1991) (noting that "[t]he attorney–client privilege may apply to confidential communications made to an accountant when the client is under the mistaken, but reasonable, belief that the professional from whom legal advice is sought is in fact an attorney"); *United States v. Boffa*, 513 FSupp 517, 523 (II) (D. Del. 1981) (holding that "the rationale behind the privilege equally supports the theory that the privilege should be extended to those who make confidential communications to an individual in the genuine, but mistaken, belief that he is an attorney"); *Dabney v. Inv. Corp. of Am.*, 82 FRD 464, 465 (E.D. Pa. 1979) (noting that "[c]ourts have recognized an exception, however, to the general requirement that an attorney-confidant be a member of the bar, in cases where the client is genuinely mistaken as to the attorney's credentials"). *Cf. Rodriguez v. Montalvo*, 337 FSupp2d 212, 218 (II) (B) (D. Mass.

-belief test in assessing whether an attorney–client relationship exists if the attorney *is* licensed to practice.[11] In those circumstances, a "reasonable belief" is one which is "reasonably induced by representations or conduct on the part of the attorney."[12] Here, given the well-established application of the reasonable-belief test to whether

---

2004) ("[C]ourts examining whether the actions or representations of an attorney's agent may be imputed to the attorney principal typically focus on the reasonable belief of the third party to whom such representations have been made.").

[11] *See, e.g.*, *Samnick v. Goodman*, 354 Ga. App. 805, 810-11 (1) (a) (841 SE2d 468) (2020) ("[W]hile the payment of a fee is relevant to the inquiry and may in some circumstances be controlling, an attorney–client relationship may be found to exist where no fee is paid, and the payment of a fee does not necessarily demonstrate the existence of the relationship. All that is necessary is a 'reasonable belief' on the part of the would-be client that he or she was being represented by the attorney. A reasonable belief is one which is reasonably induced by representations or conduct on the part of the attorney." (punctuation omitted)); *Estate of Nixon v. Barber*, 340 Ga. App. 103, 107 (1) (796 SE2d 489) (2017) ("[A]n attorney–client relationship cannot be created unilaterally in the mind of a would-be client; a reasonable belief is required." (punctuation omitted)); *Cleveland Campers, Inc. v. R. Thad McCormack, P.C.*, 280 Ga. App. 900, 904 (635 SE2d 274) (2006) (same); *Guillebeau v. Jenkins*, 182 Ga. App. 225, 231 (355 SE2d 453) (1987) (same); *see also Huddleston v. State*, 259 Ga. 45, 46 (376 SE2d 683) (1989) (noting that "[t]he relationship of attorney-client may be expressly created by written contract, or may be inferred from the conduct of the parties."); *In re Dowdy*, 247 Ga. 488, 491 (277 SE2d 36) (1981) (noting that "[g]enerally, the relation of attorney and client is a matter of contract but the contract may be express, or implied from the conduct of the parties.").

[12] *Vazemiller v. Sanders*, 360 Ga. App. 788, 791-92 (1) (861 SE2d 626) (2021) (punctuation omitted); *accord Browne & Price, P. A. v. Innovative Equity Corp.*, 361 Ga. App. 521, 528 (3) (864 SE2d 686) (2021); *Cleveland Campers*, 280 Ga. App. at 903 (2).

an attorney–client relationship exists, we conclude it is appropriate to apply the same test when a party seeks to invoke attorney–client privilege to protect communications made with a non-lawyer or inactive lawyer.[13]

Even so, Royal Texas maintains that in cases involving in-house counsel, the reasonable-belief test should include a minimal amount of due diligence by the corporate client to investigate whether counsel holds an active bar license.[14] But this

[13] *See John Ernest Lucken Revocable Tr.*, 2017 WL 627223, at *2 (describing the "reasonable belief" test as "a rational standard," which "provides adequate protection to those who reasonably rely on a person's representations of being an active attorney even if that turns out to be untrue," and noting that "[u]nder those circumstances, it is appropriate for all the protections of the attorney–client relationship to attach [because] the punishment should not be on the unsuspecting 'client' when it comes to light the imposter is not actually licensed").

[14] *See Fin. Techs. Int'l, Inc. v. Smith*, Case No. 99 CIV. 9351 GEL RLE, 2000 WL 1855131, at *6–7 (B) (3) (S.D.N.Y. Dec. 19, 2000) ("The typical lay individual seeks legal counsel when a specific problem arises. As a result, corporations do not have to suffer the potential prejudice of investigating one, and possibly more, attorneys on short notice. . . . For these reasons, the Court concludes that, even if New York would apply the reasonable belief exception to individuals, corporations would have to make sure their attorneys are in fact attorneys." (footnote omitted)).
Royal Texas also relies on other cases, which it claims all hold that a company must "exercise minimal diligence by checking the bar status of its in-house counsel." Royal Texas is mistaken. Those other cases either do not mention such a requirement or do not involve in-house counsel. *See Gordon v. Nexstar Broadcasting, Inc.*, 2019 WL 2177656 (E.D. Cal. 2019) (holding that communications were not privileged when counsel held an inactive bar license, but making no mention of any required investigation or minimal diligence); *Smith v. J.P. Morgan Chase Bank*, 2013 WL

approach has been rightly criticized because "[t]o require businesses to continually check whether their in-house counsel have maintained active membership in bar associations before confiding in them simply does not make sense."[15] Indeed, while an attorney certainly has "an obligation to ensure that he is properly practicing law—and faces the specter of disciplinary action if he engages in unauthorized practice—the sins of the attorney must not be visited on the client so long as the client has acted reasonably in its belief that its counsel is, in fact, an attorney."[16] It is simply "unreasonable to think that a corporation would deliberately turn a blind eye to the status of in-house counsel's bar membership in order to some day invoke the 'reasonable belief' exception to the rule that only communications between 'attorneys' and clients are privileged."[17] And this is yet another compelling reason for

---

129395 (D. Nev. 2013) (holding that communications were not privileged when counsel for an *individual* (not a company) did not hold an active bar license and, at times, the individual was aware that counsel did not hold an active bar license).

[15] *Gucci*, 2011 WL 9375 at *6.

[16] *Id.*

[17] *Id.* at *5 n.33.

not shifting "the burden of ensuring attorneys' compliance with complicated bar membership rules from attorneys to corporations."[18]

The question of whether a client had a reasonable belief that their attorney was authorized to practice law, of course, depends on the facts of a given case. But because our Supreme Court has explicitly held that "the same basic analysis that is conducted to assess privilege and work product in every other variation of the attorney–client relationship should also be applied to the law firm in-house counsel situation,"[19] we decline to adopt a special due-diligence requirement for in-house counsel. And for the reasons noted above, we likewise reject Royal Texas's ill-founded argument that Prusher's own knowledge about his inactive status should be imputed to Cajun Global. As a result, the trial court did not err by adopting the reasonable-belief test without requiring Cajun Global—the client—to have investigated the status of Prusher's bar license.

2. Having concluded it is appropriate to apply the reasonable-belief test under these circumstances, we must now assess Royal Texas's assertion that the trial court

---

[18] *Id.*

[19] *St. Simons Waterfront*, 293 Ga. at 419.

erred in accepting Cajun Global's statements as evidence of its reasonable belief that Prusher was authorized to act as its attorney. We conclude the court did not err in doing so, and that there is sufficient evidence to support a reasonable belief by Cajun Global.[20]

The record contains *unrefuted* evidence that Prusher's position with Cajun Global was always one in which he provided legal advice, and he was never employed in a non-legal capacity. Prusher also never disclosed his inactive bar status to anyone at Cajun Global; and before joining the company, he spent *18 years* as an assistant general counsel for Burger King. Indeed, after he joined Cajun Global as legal counsel, its CEO and CFO both sought legal advice from Prusher with the understanding that he graduated from law school and was an attorney who could provide such advice.

Still, Royal Texas points to testimony from Prusher that he "expected" Cajun Global would perform a background check when a new attorney was hired in 2022. Royal Texas also highlights Prusher's "understanding" that human resources would conduct such a review to determine attorney licensing. But significantly, there is no

---

[20] Of course, we review a trial court's decision regarding the application of a privilege, "including the attorney–client privilege, for an abuse of discretion." *Burns v. State*, 320 Ga. 320, 327 (2) (907 SE2d 581) (2024).

evidence such a policy or practice was in place when *Prusher* was hired in 2012. Nor is there evidence that anyone from Cajun Global's human resources department ever conducted such reviews. And while there is evidence Cajun Global paid Prusher's Massachusetts bar fees, nothing in the record suggests the procedure for doing so—or the paperwork received while paying those fees—made clear that Prusher was not authorized to practice law. Finally, we have already rejected Royal Texas's argument that corporations must *always* investigate bar status to have a reasonable belief that their in-house counsel is authorized to practice law.[21]

In sum, under these circumstances, there was evidence to support the trial court's conclusion that Cajun Global had a reasonable belief Prusher was an attorney

---

[21] Unlike this case, corporate counsel in *Financial Technologies*, upon which Royal Texas relies, was *never* admitted as a member to *any* bar. *Fin. Techs.*, 2000 WL 1855131, at *1 (explaining that "[t]he basis for the objection is that [counsel] is not a licensed attorney; *he has never been admitted to the bar of any state*" (emphasis supplied)); *see also* John Gergacz, *In-House Counsel and Corporate Client Communications: Can Eu Law Afterakzo Nobel and U.S. Law After Gucci Be Harmonized? Critiques and A Proposal*, 45 INT'L LAW. 817, 832 (III) (B) (1) (c) (2011) (noting that "[a]lthough the Gucci court rejected the approach taken in Financial Technologies, the cases may be reconciled" because "[i]n Financial Technologies, the attorney was never admitted to a bar, while in Gucci, in-house counsel had crossed that threshold"). To the extent Royal Texas relies on other foreign courts that adopted the reasoning of *Financial Technologies*, we find those decisions factually distinguishable or their holdings equally unpersuasive. *See infra* note 22.

authorized to practice law such that the relevant communications are protected by the

attorney–client privilege.[22]

---

[22] *See Simmons v. Flint, Connolly & Walker, LLP*, 369 Ga. App. 474, 477 (2) (893 SE2d 873) (2023) (explaining that a "reasonable belief is one which is reasonably induced by representations or conduct on the part of the attorney"); *Browne & Price, P. A. v. Innovative Equity Corp.*, 361 Ga. App. 521, 528 (3) (864 SE2d 686) (2021) (same); *see also Kleeberg v. Eber*, No. 16CV9517LAKKHP, 2019 WL 2085412, at *14 (S.D.N.Y. May 13, 2019) ("Absent any contradictory evidence showing that [clients] knew or should have known that [counsel] was no longer licensed to practice law, the available evidence shows, at a minimum, that the [clients] reasonably believed [counsel] continued to be a licensed attorney after he left his firm."); *Gucci Am.*, 2011 WL 9375, at *5 (IV) (B) (concluding there was "more than sufficient evidence" to support a reasonable belief that in-house counsel was the corporation's attorney when in-house counsel (1) held a number of legal positions in the corporation; (2) appeared in court and before administrative agencies and conducted legal work on corporation's behalf; (3) had his bar membership paid by the corporation; and (4) former and current executives stated they all considered in-house counsel an attorney). *Cf. Charlestown Cap. Advisors, LLC v. Acero Junction, Inc.*, Case No. 18CV4437JGKBCM, 2020 WL 757840, at *7 (II) (B) (2) (S.D.N.Y. Feb. 14, 2020) (concluding there was no attorney–client privilege when (1) purported attorney was hired to do non-legal work and had spent the previous eight years doing similar non-legal work; (2) company's owner did not know whether purported attorney *was* an attorney and did not rely upon him "as a lawyer"; and (3) purported attorney performed tasks routinely performed by non-legal personnel); *Madelaine Chocolate Novelties, Inc. v. Great N. Ins. Co.*, Case No. 15CV5830RJDSMG, 2020 WL 606447, at *2 (E.D.N.Y. Feb. 7, 2020) (concluding there was no attorney–client privilege when purported attorney was (1) hired by his own brother-in-law who was "generally familiar" with his career; (2) hired as "director of corporate development" with management, rather than legal, responsibilities; and (3) stopped referring to himself as "general counsel" before the events in question took place and held the title of "chief administrative officer"); *John Ernest Lucken Revocable Tr.*, 2017 WL 8640924, at *3 (II) (B) (concluding there was no reasonable belief when it was "undisputed that [purported

15

For all these reasons, we affirm the trial court's judgment.

*Judgment affirmed. Mercier, J., and Senior Judge C. Andrew Fuller, concur.*

---

attorney] did not hold an active license to practice law when he advised plaintiffs[,] and plaintiffs *were aware of his law license's inactive status*" (emphasis supplied)); *Anwar*, 982 FSupp2d at 266 (II) (B) (concluding there was no reasonable belief when purported attorney "[was] not, and has never been, licensed in any jurisdiction and has neither held himself out to be a licensed attorney nor performed acts suggesting to his employer that he was admitted to the Netherlands bar").