A07A0218. IN THE INTEREST OF C. T. et al., children.

(648 SE2d 708)

RUFFIN, Judge.

The juvenile court entered an order terminating the parental rights of the mother of C. T., S. T., Z. K., and L. K.[1] The mother appeals, arguing that her rights were terminated without clear and convincing evidence of parental misconduct or inability. She also

---

[1] In the same order, the trial court also terminated the parental rights of the children's fathers. The father of C. T. and S. T. apparently did not appeal the order. However, the father of Z. K. and L. K. appealed, and the ruling was affirmed. See *In the Interest of Z. K.*, 285 Ga. App. 150 (645 SE2d 637) (2007).

contends that the juvenile court erred in determining that termination was in the children's best interests. For reasons that follow, we reverse.

1. As a threshold matter, we must address grave shortcomings with respect to the record citations in the briefs. At the hearing in this matter, the attorney for the Department of Family and Children Services ("DFCS") asked the juvenile court to leave the record open in order for it to tender a certified copy of the court's record, which was to be admitted as Exhibit 1. The court agreed, and the entire record — consisting of well over 100 pages — was attached to the transcript as Exhibit 1. The exhibit was not numbered. Nonetheless, in its brief, DFCS relies largely upon this lengthy, unnumbered exhibit to support its factual assertions. After the first factual assertion on page two of its brief, DFCS simply cites to "Dep't Ex. 1." For the next five and a half pages, the only citation DFCS provides is "Id." Thus, the citations to the record are essentially useless. Indeed, DFCS does not even bother to specify to which document in the voluminous exhibit it refers, such as pointing to a case plan or an order of a specified date. The mother's brief utilizes similarly vague references to "Ex. 1."

Under this Court's rules, references to the record must be both to a specific volume or part of the record and by specific page number.[2] Moreover, this Court has made abundantly clear that we will not cull the record on behalf of a party.[3] Thus, it is incumbent upon the parties to ensure that the record arrives at this Court in a manner designed to facilitate our review of the record. Here, given that the record was unnumbered, the record citations are wholly inadequate. Under these circumstances, we will not sift through the multitudinous documents in an attempt to ascertain what transpired below.[4] If we have omitted any fact or failed to locate relevant evidence, the responsibility lies with counsel.[5]

2. In reviewing a juvenile court's order terminating parental rights, we view the evidence in a light most favorable to the juvenile court's ruling "and determine whether any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody should be terminated."[6] Viewed in this manner, the properly cited evidence of record reveals that the mother has four

---

[2] See Court of Appeals Rule 25 (c) (3) (i), (iii).

[3] See, e.g., *Cleveland Campers v. R. Thad McCormack, P.C.*, 280 Ga. App. 900 (1) (635 SE2d 274) (2006); *Patterson v. Lopez*, 279 Ga. App. 840, 841 (2) (632 SE2d 736) (2006); *In the Interest of A. T. H.*, 248 Ga. App. 570, 574 (2) (547 SE2d 299) (2001); *Gentry v. State*, 212 Ga. App. 79, 80 (1) (441 SE2d 249) (1994).

[4] See *Cleveland Campers*, supra.

[5] See id.

[6] (Punctuation omitted.) *In the Interest of B. D.*, 281 Ga. App. 725 (637 SE2d 123) (2006).

children ranging in age from four to ten. DFCS first became involved with the family in April 2000 when it received reports of "inadequate housing." After that case was resolved and closed, DFCS again received referrals in March 2002 and August 2002, indicating that the children were living in squalor. According to the DFCS caseworker, the home was "extremely filthy" with trash scattered throughout the house, food left on the floor, dog feces throughout the house, and no electrical power.

Eventually, the children were removed from the mother's custody in October 2002 after the two youngest children overdosed on their mother's medication. According to the mother, she had been taking medication for depression, but she had not taken medication in several years and had successfully undergone in-patient treatment at Georgia Highlands.[7] The mother completed the reunification plan, and the children were returned to her custody in November 2003. In May 2004, however, DFCS received another report that the children were living in "[d]eplorable home conditions" and were unsupervised. The children were once again removed from the mother's care, and a new reunification case plan was devised, which required the mother to: maintain a source of income; maintain stable housing; complete a psychological evaluation; schedule a vocational rehabilitation assessment; visit the children; pay child support; and undergo drug screening.

The record shows that the mother met virtually all of her case plan goals. She obtained vocational rehabilitation and had been employed almost the entire time the children were in DFCS custody. At the time of the hearing, the mother had worked for the same company for a year, earning, on average, $800 per month. The mother also underwent the required psychological evaluation and passed six DFCS-ordered drug tests. Significantly, the mother made every scheduled visitation with her children — 84 in total — and maintained a positive bond with them.

At the time of the hearing, the mother and her husband — the father of Z. K. and L. K. — rented a two-bedroom one-bathroom trailer. They lived at that location for three months before the hearing.[8] The DFCS case manager made one unannounced visit to the home, but was unable to see the inside as the mother was at work. According to the caseworker, she saw multiple bags of garbage outside the home and noticed that the steps leading to the door were

---

[7] The mother testified that she suffered from depression after having been molested as a child, but that she was no longer hampered by depression.

[8] The father testified that he and his wife previously lived for eight months in a larger mobile home that they tried to buy, but that they were forced to leave as part of a mass eviction. The juvenile court found that the eviction was "[t]hrough no fault" of the parents.

loose. A week before the hearing, the caseworker returned to the home to inspect the interior. She noticed several items that needed repair, including an exposed water heater, a fuse box located too close to the children's beds, and a broken light fixture. She also noticed the presence of ashtrays, which concerned her because one of the children has asthma. However, the caseworker conceded that the house was clean.

The one aspect of the case plan that the mother did not fulfill was payment of child support. Specifically, she was $1,400 in arrears. The testimony showed that, given the mother's limited income, she had difficulty meeting her financial obligations, which included payment of rent, utilities, and insurance.[9] Although the mother had a Ford Explorer that had been paid for, she was making payments on a second car. According to the mother, she did so because the Ford "is a gas guzzler." At the time of the hearing, the Ford was uninsured, but the parents kept it because they would need the larger vehicle when the children were returned. In addition, the mother admitted that she and her husband smoked, a habit that cost them approximately $90 per month.

Following the hearing, the juvenile court issued an order in which it noted that the

> family is completely dependent upon the mother's income. The parents continue to be unable to manage their finances appropriately. They had a working car which was paid for, but purchased a car for which they have to make payments. They admit their child support payments are in arrears because they are unable to afford to pay same.

Thus, based in large part upon the parents' "dire financial straits" and the fact that their current mobile home was "not suitable for the family due to the size and . . . needed repairs," the juvenile court terminated the mother's parental rights. This appeal followed.

"Because no judicial determination has more drastic significance than permanently severing a parent-child relationship, such severance must be exercised cautiously and scrutinized deliberately."[10] In order to warrant the severing of such relationship, "a juvenile court must first determine whether there is *present* clear and convincing

---

[9] The father relies upon his wife's income as he is currently unemployed and has difficulty obtaining employment because he is illiterate.

[10] (Punctuation omitted.) *In the Interest of T. P.*, 270 Ga. App. 700, 706 (4) (608 SE2d 43) (2004).

evidence of parental misconduct or inability."[11] This is found by proof that: (1) the children are deprived; (2) lack of proper parental care and control caused the deprivation; (3) the cause of the deprivation is likely to continue or will not likely be remedied; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the children.[12]

Here, the mother concedes her inability to challenge the first two factors, focusing instead on the last two. According to the mother, "the progress she made towards completing her case plan goals for reunification illustrates that the children's deprived state is unlikely to continue." We agree.

Although the apparently deplorable condition of the mother's house prior to DFCS's most recent involvement is troubling, the mother's "past unfitness, alone, is insufficient to terminate her right to custody. A finding of parental unfitness must be based on present circumstances."[13] In many respects, the mother's present compliance with her case plan is exemplary. Notably, she has maintained both employment and a lasting bond with her children. Her shortcomings with regard to her case plan stem largely from her relative poverty. However, poverty alone is not a basis for termination.[14] Under these circumstances, we cannot permit DFCS and the juvenile court to "establish societal standards, unrelated to parental bonds of love or the unique natural protectiveness of a parent for offspring; quantifying and qualifying the socially acceptable environment which a parent must afford a child or be subjected to severance of the parental cords."[15] In other words, although the mother may struggle financially and indeed may need assistance in the care of her children, the mere fact that she earns little money and lives in a modest home does not constitute clear and convincing evidence that the mother is unfit and that the children's deprivation is likely to continue.[16] Accordingly, we reverse the juvenile court's order terminating the mother's parental rights.[17] In view of this ruling, we need not address the mother's remaining enumeration of error.

*Judgment reversed. Blackburn, P. J., and Bernes, J., concur.*

---

[11] (Punctuation omitted; emphasis in original.) *In the Interest of L. J. L.*, 247 Ga. App. 477, 479 (543 SE2d 818) (2001).

[12] See id.

[13] (Punctuation and footnote omitted.) Id. at 480.

[14] See *Shover v. Dept. of Human Resources*, 155 Ga. App. 38, 39-40 (1) (270 SE2d 462) (1980).

[15] Id. at 39.

[16] See id.; *In the Interest of L. J. L.*, supra.

[17] See id.; *In the Interest of K. M.*, 240 Ga. App. 677, 680-681 (523 SE2d 640) (1999).

DECIDED JUNE 27, 2007.

*Rodney Q. Quarles*, for appellant.

*Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Cynthia N. Johnson*, for appellee.