**WHOLE COURT**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**July 16, 2013**

# In the Court of Appeals of Georgia

A13A0792. IN THE INTEREST OF C. J. V. et al., children.

McMILLIAN, Judge.

The mother of C. J. V., and F. N. R., born in January 2007 and January 2009, respectively, appeals from the trial court's order terminating her parental rights. Because the evidence does not show clearly and convincingly that the cause of the deprivation of the children is likely to continue or will not likely be remedied, we must reverse the order of termination.

On appeal from a juvenile court's order terminating a parent's rights, we view the evidence in the light most favorable to the court's decision and determine whether any rational trier of fact could have found by clear and convincing evidence that the parent's rights should have been terminated. *In the Interest of C. S.*, 319 Ga. App. 138, 139 (735 SE2d 140) (2012). Additionally,

[w]e proceed in a termination case with the knowledge that there is no judicial determination which has more drastic significance than that of permanently severing a natural parent-child relationship. It must be scrutinized deliberately and exercised cautiously. The right to raise one's children is a fiercely guarded right in our society and law, and a right that should be infringed upon only under the most compelling circumstances."

(Citations and punctuation omitted.) *In the Interest of M. A.*, 280 Ga. App. 854, 856 (635 SE2d 223) (2006). *In the Interest of T. E. T.*, 282 Ga. App. 269, 269-270 (638 SE2d 412) (2006); *In the Interest of T. J. J.*, 258 Ga. App. 312, 314 (574 SE2d 387) (2002).

Before terminating a parent's rights, a juvenile court must employ a two-prong test. In the first prong, the court must decide whether there is present clear and convincing evidence of parental misconduct or inability. OCGA § 15-11-94 (a). Parental misconduct or inability, in turn, is proven by evidence showing : (1) that the child is deprived; (2) that lack of proper parental care or control is the cause of deprivation; (3) that the cause of deprivation is likely to continue or will not likely be remedied; and (4) that continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. OCGA § 15-11-94 (b) (4) (A). In the second prong of the termination test, the juvenile court must consider whether termination of parental rights would be in the best interest of the child.

(Citation omitted.) *In the Interest of R. N. H.*, 286 Ga. App. 737, 739-740 (650 SE2d 397) (2007). Moreover, OCGA § 15-11-94 (b) (4) (B) sets out several factors that a juvenile court may consider in deciding whether the child is without proper parental care and control. And if the children are not in the parent's custody, pursuant to OCGA § 15-11-94 (b) (4) (C),

> the court shall consider, without being limited to, whether the parent without justifiable cause has failed significantly for a period of *one year or longer prior to the filing of the petition for termination of parental rights:* (i) To develop and maintain a parental bond with the child in a meaningful, supportive manner; (ii) To provide for the care and support of the child as required by law or judicial decree; and (iii) To comply with a court ordered plan designed to reunite the child with the parent or parents.

(Emphasis supplied.)

Without belaboring the point, we will assume that the evidence was sufficient to show that the children were deprived since the mother did not appeal that determination. Accordingly, we will focus our analysis on whether the evidence clearly and convincingly showed that the deprivation was likely to continue since we believe that is the dispositive inquiry here.

3

The termination petition in this case was filed on May 24, 2012, less than one year after the initial case plan was entered on June 29, 2011. The mother's reunification goals included attending parenting classes, obtaining and maintaining a source of income and stable housing, maintaining visitation with the children, "follow[ing] through with Vocational Rehab for assistance with employment," completing a psychological evaluation and following through with recommendations, and paying child support.

The evidence at the termination hearing, which took place in August 2012, showed that despite the fact that the mother lived in an area of the State that had been particularly hard hit by recent economic downturns, the mother had been able to secure a job and had been working for about three to four months. Further, although the mother had been "laid off" at the time of the hearing, she testified that she had been definitively told by her employer that she would be called back, although she did not have an exact date for when that would be. The mother had already applied for unemployment benefits, although she had been laid off for only about one week. The mother had also been living on her own in an efficiency unit for about six months, and although the mother's sister signed the lease and paid the rent for the first three months, the mother had apparently been paying the rent since that time.

4

The mother had also met the case plan requirement of attending a parenting class and completing a psychological evaluation. Further, she had consistently visited the children, and by all accounts she had a bond with them, knew how to care for them, interacted appropriately with them, and provided them presents at appropriate times. Further, she had started making child support payments after she got a job, and had made two payments totaling almost $700.

The juvenile court recognized that the mother had met some of the case plan goals, but found that the mother had not met the goals of securing stable employment because she was unemployed at the time of the hearing. Further, the juvenile court opined that because she was currently unemployed, she was in danger of losing her housing and noted the mother's history of instability with income and housing. The juvenile court acknowledged that the mother had made two child support payments, but noted that the mother did not start paying child support until after the petition was filed. Likewise, although the juvenile court recognized that the mother had completed the psychological evaluation, he did not consider her to have fulfilled the plan requirement because she had not followed through with the recommended treatment. And the court made a negative finding concerning the mother's failure to participate in a vocational rehabilitation program. Thus, the court concluded that the children

would be currently deprived if returned to the mother because of her lack of stable, suitable housing, her lack of income, her failure to pay child support and her failure to complete "many" of the case plan goals.

Although "[i]t is well settled that a juvenile court may consider the past conduct of the parent in determining whether the conditions of deprivation are likely to continue, . . . it is equally true that evidence of past unfitness, standing alone, is insufficient to terminate the rights of a parent in her natural child; clear and convincing evidence of *present* unfitness is required. Moreover, the record must contain clear and convincing evidence that the cause of deprivation is likely to continue." (Citations and punctuation omitted; emphasis in original.) *In the Interest of D. L. T. C.*, 299 Ga. App. 765, 769 (1) (684 SE2d 29) (2009). In our view, even construing the evidence in the light most favorable to the termination order, as we must on appeal, several pertinent findings in the juvenile court's order were either contrary to or not clearly and convincingly shown by the evidence.

First, contrary to the juvenile court's findings, the record shows that at the time the termination petition was filed, *which was less than one year after the case plan was put into place*, the mother *had* met or substantially completed many of the major goals of her case plan. She had been able to secure employment, and although she

6

was temporarily laid off, she was certain she would be called back to work and in the interim had already applied for unemployment benefits. Thus, the juvenile court merely speculated that the mother might be without income for such a length of time that she was in danger of losing her residence because she would not be able to pay for it. And although the mother did not participate in vocational rehabilitation, she was able to secure employment through her own efforts. Further, the mother had made significant efforts to pay child support after she had secured employment, paying a substantial amount in a short period of time although her hourly wages were not high.

Further, the mother had completed her psychological evaluation. Although the juvenile court nevertheless counted this as a failure because she apparently did not follow up on the recommended treatment, neither the psychological examination nor the results were introduced into evidence at the termination hearing, and the report does not otherwise appear in the record. Thus, we do not know how minor or trivial those recommendations might have been, or even whether they related to any aspect of the mother being able to parent her children. And, importantly, there is no other evidence in the record to suggest that the mother suffered from any medically verifiable deficiency of a mental or emotional nature that would result in an inability

to parent her children. Moreover, as with the case plan in general, the mother was given only a short period of time to complete the recommendations before the termination petition was filed and the hearing held.

Thus, it appears that this is a case where the primary reason the mother's rights were terminated was due to economic inability to provide for the children, and that her shortcomings in failing to comply with the two major components of her case plan "stem largely from her relative poverty. However, [it is well established that] poverty alone is not a basis for termination." (Citation omitted.) *In the Interest of C. T.*, 286 Ga. App. 186, 190 (648 SE2d 708) (2007). Similarly, we have held that the fact that a mother is "unemployed, without prospects for future employment, and without any stable living arrangements" is not sufficient to terminate parental rights. *Chancey v. Dept. of Human Resources,* 156 Ga. App. 338, 340 (1) (274 SE2d 728) (1980). Moreover, in this case there is no evidence of a verifiable mental or physical condition that indicates the mother is incapable of caring for the children. And the juvenile court appears to have totally discounted the fact that despite the hurdles facing the mother in her bleak economic environment, she managed to find a job which gave her enough income to pay her rent and make several substantial child support payments. Accordingly, this is not a case where the "evidence" consisted of

8

merely "positive promises" from the parent that she would change and rectify past failures so as to avoid termination of her parental rights, and the juvenile court appears to have prematurely discounted the mother's progress toward meeting her goals. Further, the mother's efforts to maintain a bond with her children appeared to be consistent throughout, and it appears that she had been successful in maintaining that bond during the limited amount of visitation she was allowed.[1]

> As we have stated, termination of parental rights is a remedy of last resort and can be sustained only when there is clear and convincing evidence that the cause of the deprivation is likely to continue. In the instant case, the evidence is not clear and convincing, at least at this time, that the deprivation is likely to continue. While we are reluctant to reverse the juvenile court's determination, no judicial determination is more drastic than the permanent severing of the parent-child relationship. Accordingly, we reverse the judgment and remand the case for establishment of a reunification plan for the appellant, subject to whatever disposition is warranted by future events and those occurring since the last termination hearing.

(Citations and punctuation omitted.) *In the Interest of C. S.*, 319 Ga. App. 138, 148 (735 SE2d 140) (2012). *In the Interest of M. T. F.*, 318 Ga. App. 135 (733 SE2d 432)

---

[1] The mother testified that initially she was allowed to visit every week with the children, but that amount was reduced to every two weeks and then to once per month.

(2012) (although mother did not have verifiable proof of income, she had maintained stable housing and her prospects for future employment were high); *In the Interest of K. J.*, 226 Ga. App. 303 (486 SE2d 899) (1997) (termination not warranted because juvenile court's determination that mother could not maintain an independent lifestyle was premature). Compare *In the Interest of J. J. J.*, 289 Ga. App. 466, 469-470 (657 SE2d 588) (2008) (deprivation likely to continue when appellant had medically verifiable deficiency of mental or emotional health, failed to support the child, comply with reunification plan and failed to establish bond).

Because we find that the evidence does not support a determination that the causes of the deprivation are likely to continue or will not likely be remedied, we need not reach the issue of harm or the second stage of the inquiry concerning the best interests of the children.

*Judgment reversed. Phipps, C. J., Doyle, P. J., McFadden and Boggs, JJ., concur. Dillard, J., concurs fully and specially. Andrews, P. J., dissents.*

A13A0792. IN THE INTEREST OF C. J. V. et al., children.

D<small>ILLARD</small>, Judge, concurring specially.

This was not a close case. As the majority aptly demonstrates, the evidence presented to the trial court did not clearly and convincingly show that the cause of the deprivation of the children is likely to continue or will not likely be remedied. I, of course, agree with this conclusion, and I fully concur with the majority opinion. Nevertheless, I write separately to highlight and repudiate the troubling reasoning employed by the trial court below and adopted by my dissenting colleague.

In a nutshell, this case is the poster child for all that is wrong with this Court's termination-of-parental-rights jurisprudence: the mother essentially had her parental rights terminated by the trial court for being poor. And while I am certainly appalled by that decision, I do not entirely fault the juvenile-court judge, who did nothing more than parrot language and sentiments this Court frequently uses to justify terminating parental rights:

- "The mother was required to obtain/maintain stable housing with sufficient space to meet the needs of her children for at least six months."

- "[T]he mother admitted to having at least seven different residences since the removal [of her children], and [s]ix of those were with 'friends.'"

- "Her current residence . . . is leased in the name of her sister, who paid her rent for her first three months," and is "a one room efficiency in a lodge."

- "The mother was required to obtain/maintain sufficient income for at least six months," and she "remained unemployed until three months prior to the hearing."

- The mother "is now unemployed once again" and "currently has no source of income."

- The mother "admits she draws food stamps for herself."

- "The mother was required to pay support for the benefit of the children," but "paid NO support until well after this petition was filed."

- "The mother has a history . . . [that] includes repeated problems with stability in income and housing."

- "The mother has no stable, suitable housing . . . no income . . . [, and she] has substantially failed to support the children for a period of more than twelve months."

In other words, the mother is really, really poor.

It is the height of irony that Georgia, a state founded for the purpose of providing a fresh start for those whose "misfortunes and want of Employment . . . are not able to provide a maintenance for themselves and *Families*,"[1] now has an institutionalized policy of severing the natural parent-child relationships of its poorest

---

[1] GEORGIA'S CHARTER OF 1732 (Albert B. Saye ed., University of Georgia 1942) (emphasis added), *available at* http://georgiainfo.galileo.usg.edu/charter.htm.

2

and most vulnerable citizens simply because they are unable to keep up with the Joneses. Some may call this progress. I do not. And, in any event, I do not think such a policy is even remotely constitutional. The United States and Georgia Constitutions require that the State must proffer compelling facts before terminating and, thus, permanently extinguishing, parental rights.[2] This is not such a case, and the trial court clearly erred in terminating the mother's parental rights.

Specifically, the trial court and dissent err in concluding that a parent's mere failure to meet certain aspects of the State's reunification plan in any way justifies the termination of her parental rights.[3] Indeed, the notion that parental rights can be

---

[2] *See In the Interest of A. C.*, 285 Ga. 829, 833 (2) (686 SE2d 635) (2009) (emphasizing that "[o]ne who is subject to the termination of parental rights cannot be equated to an individual who faces an interruption of custody" because termination "is a much more severe measure" that acts as a "remedy of last resort to address the most exceptional situation of a deprived child and that child's continuing deprivation"); *Blackburn v. Blackburn*, 249 Ga. 689, 692 (2) (292 SE2d 821) (1982) (acknowledging that "freedom of personal choice in matters of family life is a fundamental liberty interest protected by the United States Constitution," and that "the Due Process Clause of the Fourteenth Amendment demands that before a state may sever the rights of parents in their natural child, the state must support its allegations by at least clear and convincing evidence" (punctuation and emphasis omitted)); *In the Interest of J. E.*, 309 Ga. App. 51, 62 n.10 (711 SE2d 5) (2011) (Dillard, J., dissenting) (collecting authorities and cases regarding the fundamental constitutional right of familial relations).

[3] *See In the Interest of E. G.*, 315 Ga. App. 35, 47 (726 SE2d 510) (2012) (Dillard, J., concurring fully and specially) ("I also disagree with the majority's

3

terminated, in part, because a parent has failed to secure *independent* housing, *stable* employment, or work on "vocational rehabilitation" (or the like) is not only patently unconstitutional[4] but morally repugnant—as such "goals," *inter alia*, disproportionately discriminate against those who are socioeconomically

---

suggestion that a natural parent's rights can be terminated merely because the father failed to satisfy certain elements of the State's reunification plan (*e.g.*, securing stable employment and housing) . . . ."); *In the Interest of A. E. S.*, 310 Ga. App. 667, 671 (714 SE2d 148) (2011) (Dillard, J., concurring specially) (same); *In the Interest of J. E.*, 309 Ga. App. at 66 n.19 (same); *In the Interest of M. S. S.*, 308 Ga. App. 614, 626 (708 SE2d 570) (2011) (Dillard, J., concurring fully and specially) (same).

[4] *See In the Interest of L. J. L.*, 247 Ga. App. 477, 479 (543 SE2d 818) (2001) (noting that "there is no judicial determination which has more drastic significance than that of permanently severing a natural parent-child relationship"(punctuation and footnote omitted)); *In the Interest of K. J.*, 226 Ga. App. 303, 306 (486 SE2d 899) (1997) (holding that a judicial determination terminating parental rights "must be scrutinized deliberately and exercised most cautiously," and that "compelling facts are required to terminate parental rights" (punctuation and citations omitted)); *In the Interest of J. E.*, 309 Ga. App. at 62 (Dillard, J., dissenting) ("Thus, in applying the constitutionally mandated standard of review and accompanying statutory criteria to termination-of-parental-rights cases, we are bound to do so bearing in mind that under both the United States and Georgia Constitutions, a parent has a fundamental constitutional right to, and liberty interest in, the care, custody, and management of his or her children, and that the State may not infringe upon or sever this fiercely guarded right of familial relations *except in the most compelling and extraordinary of circumstances.*" (footnotes omitted) (emphasis supplied)); *see also id.* at n.10 (collecting authorities and cases regarding the fundamental constitutional right of familial relations).

4

disadvantaged.[5] To be sure, securing independent housing, stable employment, and furthering one's job training or education are commendable goals, and there is nothing inherently wrong with the government *encouraging* the citizens it serves to better their lives. What the government is *not* entitled to do, regardless of any *apparent* statutory authority for doing so, is to *force* some generalized, bureaucratic, Orwellian notion of parenting onto citizens who have temporarily lost custody of their children as a precondition to regaining custody of those children.[6] Indeed, I find it

---

[5] *See generally* Janet L. Wallace, *Judging Parents, Judging Place: Poverty, Rurality, and Termination of Parental Rights*, 77 Mo. L. Rev. 95 (2012); *id.* at 112 (III) (A) ("Poverty frequently plays a role in child removal and failed reunification, with studies indicating that only when there is no adequate source of income are the children more likely to be removed, and at a very high rate." (punctuation and footnote omitted)); *id.* at 116 (III) (B) (noting that "the state sometimes removes children because their parents lack outward signs of a middle-class lifestyle," that "[j]udges and caseworkers . . . often impose middle-class values and expectations on impoverished families, who may not fit dominant cultural paradigms, such as white, married, middle-class, and suburban," and that "dominant society does not view poor families as 'real' families," devaluing these socioeconomically disadvantaged families "to the point of tolerating the termination of the parent-child relationship" (punctuation and citation omitted)).

[6] *See* Wallace, *supra* note 5 at 107 (II) (B) (noting that "some states treat a parent's inability to comply with a reunification plan as prima facie evidence that returning the child to the parent would be detrimental," and that "reunification plans leave the state focusing on whether the parent has complied with a lengthy checklist of actions rather than on whether the parent is able to care for the child"); *id.* ("The issue is no longer whether the child may be safely returned home, but whether the mother has attended every parenting class, made every urine drop, participated in

deeply troubling that both the trial court and dissent justify the termination of the mother's parental rights, in part, because she has moved from place to place, lived with different people, depended on others for financial support, and failed to provide toys for her children. The State has no right to irrevocably sever the natural parent-child relationship simply because a parent is incapable of providing her children with an idyllic middle-class lifestyle. And while it is certainly heartening to know that the children are thriving in their foster home, the State has no business facilitating the adoption of children entrusted to its care until and unless a parent has, by her actions or inaction, forfeited her constitutional right to familial relations. The State's primary goal must be to maintain and preserve the natural parent-child relationship, not to act as a clandestine adoption agency.

I also disagree with the trial court and dissent's suggestion that a natural parent's rights can be terminated merely because she was not financially or

---

every therapy session, shown up for every scheduled visitation, arrived at every appointment on time, and always maintained a contrite and cooperative disposition . . . Sometimes permanency plans are so complicated or onerous that they seem designed to ensure failure." (ellipses in original)); *id.* (noting that "such plans are not only subjective, they are not centered on children's well-being . . . and leave little room for consideration of context" (footnote omitted)).

emotionally capable of parenting her child at the time of the termination hearing.[7] I likewise disapprove of the trial court and dissent's reliance "on generalized notions of permanency as a basis for terminating parental rights."[8] As I have previously explained,

> [w]hile I do not quibble with the general proposition that children need permanency (or, for that matter, the corollary that long-term foster care can have ill effects), I find it troubling that many of our prior decisions upholding the termination of parental rights appear to rely, in part, on such generalizations without specifically tying them to particularized findings of fact, even though we have repeatedly held that a juvenile court is required to make *explicit* findings of fact that *the child at issue*—rather than some hypothetical child placed in the subject child's situation—will suffer or is likely to suffer *serious* harm as a result of the continued deprivation.[9]

I also do not share the trial court and dissent's view that the pertinent question in analyzing whether the continued deprivation is likely to cause serious mental, emotional, physical, or moral harm is whether the child would be harmed if returned

---

[7] *See In the Interest of M. S. S.*, 308 Ga. App. at 626.

[8] *In the Interest of J. E.*, 309 Ga. App. at 66.

[9] *Id*. (footnotes omitted).

to the parent's care and control, associated environment, and state of deprivation. As I have previously explained,

> [t]he overarching question in a termination proceeding is not whether the child has a model parent, or even whether that parent is presently capable of taking his or her child back into custody, but is instead whether the natural parent-child relationship has been *irretrievably* damaged as a result of the parent's unwillingness or inability to care for the child—i.e., that the continuation of the natural parent-child relationship, as it *presently* exists with the child in the custody of the State, is causing or is likely to cause that child serious harm. As our Supreme Court has recently and *rightly* emphasized, "[o]ne who is subject to the termination of parental rights cannot be equated to an individual who faces an interruption of custody" because termination "is a much more severe measure" that acts as a "remedy of last resort to address *the most exceptional situation* of a deprived child and that child's continuing deprivation." Put another way, it is one thing to remove a child from a parent's custody for reasons of neglect, but quite another to permanently and irrevocably sever the natural parent-child relationship. And there is a reason for this crucial distinction: Terminating a parent's rights, and thus forever foreclosing the possibility of restoring the natural parent-child relationship, is governmental *extinguishment* of the parent and child's constitutional right to familial relations.[10]

---

[10] *Id.* at 61 (footnotes omitted).

8

In sum, I vehemently disagree with the reasoning employed by the trial court and dissent in seeking to terminate the mother's parental rights, which, to be fair, is typical of that utilized by this Court in termination-of-parental-rights cases.[11] In my view, this reasoning makes a mockery of the cherished and sacrosanct right to familial relations and the concomitant right of parents to raise their children as they see fit,[12] and I will continue to highlight this Court's inherently flawed and unconstitutional

---

[11] In this respect, I wish to make clear that I have nothing but the utmost respect and admiration for the juvenile-court judge and my distinguished dissenting colleague. And to the extent the tone of this concurrence comes across as being somewhat obstreperous, the reader should understand that my frustration is not with my esteemed colleagues, but is instead directed squarely at this Court's deeply troubling termination-of-parental-rights jurisprudence.

[12] *See In the Interest of J. E.*, 309 Ga. App. at 63 ("Unfortunately, I believe this Court has, in recent years, lost sight of the serious constitutional implications that result from a juvenile court's termination of parental rights . . . ."); *id*. at 68 n.31 (outlining constitutional, jurisprudential, and historical basis of parental rights); *see also O'Connell v. Turner*, 55 Ill. 280, 284-85 (Ill. 1870) (noting that "[t]he parent has the right to the care, custody and assistance of his child," that "[t]he duty to maintain and protect it, is a principle of natural law," and that "every attempt to infringe upon it, except from dire necessity, should be resisted in all well governed States"); Bruce C. Hafen, *Children's Liberation and the New Egalitarianism: Some Reservations about Abandoning Children to Their Rights*, 1976 BYU L. REV. 605, 615 (1976) ("For this reason, both English and American judges view the origins of parental rights as being even more fundamental than property rights. Parental rights to custody and control of minor children have been variously described as sacred as a matter of natural law, and as inherent, natural rights, for the protection of which, just as much as for the protection of the rights of the individual to life, liberty, and the pursuit of happiness, our government is formed." (punctuation and citation omitted)).

9

approach to these cases as long as I am privileged to serve Georgians in my capacity as an appellate judge. An order terminating parental rights is the death penalty of civil cases, and this Court should start treating it as such.

A13A0792.  IN THE INTEREST OF C. J. V. et al., children.

ANDREWS, Presiding Judge, dissenting.

Because I believe that, given this record, and deferring to the juvenile court's fact-finding, weighing of the evidence and credibility determinations, as we must, there was sufficient clear and convincing evidence to support the juvenile court's decision, I respectfully dissent.

The record shows that the Department of Family and Children Services (Department) first investigated the children's living conditions in December 2010, when they were called in because of "lack of supervision." The mother's history was that she moved from place to place, living with different people and depending on them for financial support. The mother was given a Parent Aide to help her with a job search and parenting duties, but did not cooperate. The mother moved three times between December 2010 and June 2011 when the Department took custody. At one point she lived with someone who was also involved with the Department and was told that she could not leave her children with this person. Nevertheless, the mother left her children with the roommate for "days at a time." At the time the Department took custody, the family had moved to a place in which the children had no toys or beds, a foster parent had to bring in necessities such as juice, because the mother

could not provide them, and neither the mother nor the roommate could give the names of the men who were living there with them.

The Department caseworker testified that the mother's interest in complying with the case plan had waned. The caseworker said that the mother cooperated at first, but it had become increasingly difficult to get in touch with her. The caseworker stated that the children are in a "foster to adopt home" and are "doing great." Both the CASA and the guardian ad litem recommended termination as being in the children's best interest. The guardian ad litem stated that his recommendation was based on the mother's failure to show an interest in completing her case plan. According to the guardian ad litem, the mother's failure to complete the recommendations following the psychological evaluation was a concern because the children could not go back to the mother until this was accomplished.

In its termination order, the juvenile court found that although the mother had completed the parenting classes and had visited with the children once a month,[1] she had failed to comply with the other requirements of the case plan and had paid no child support until well after the termination petition was filed. The court found that

---

[1] Although the mother did keep up with her visitation, the record shows that the number of visits per month was reduced because of the mother's missed visits.

2

the mother was currently unemployed and in danger of losing her residence. The children had been in foster care for 13 months and the court saw "no hope in the immediate future of being able to return the children to either parent."

Therefore, there was sufficient clear and convincing evidence that the children were deprived and that the deprivation was likely to continue.  As stated, the mother has no income, her sister paid the rent on the apartment, and the apartment was leased in the sister's name. The caseworker testified that the mother was no longer as interested in complying with the case plan and it was increasingly difficult to get in touch with her. "[W]hat weight to give recent improvements is a question for the trier of fact. In considering a parent's claims of recent improvement, the trial court, not the appellate court, determines whether a parent's conduct warrants hope of rehabilitation." (Punctuation and footnotes omitted.) *In the Interest of A. T. H.,* 248 Ga App. 570, 573 (547 SE2d 299) (2001).

The majority cites to *In the Interest of C. T.*, 286 Ga. App. 186 (648 SE2d 708) (2007), as support for its holding that poverty alone should not be a basis for termination.  But in that case, the mother did have a steady job and did have permanent housing, although she struggled financially. Id. at 190. Further, in that case, the mother's compliance with her case plan was "exemplary." Id.

3

The law is that the "mother's failure to make any significant progress toward achieving the goals of stable employment and stable housing, standing alone, was sufficient to support the juvenile court's finding that the cause of [the children]'s deprivation was likely to continue." *In the Interest of M. S. S.*, 308 Ga. App. 614, 621 (708 SE2d 570) (2011) citing *In the Interest of A. R.,* 302 Ga. App. 702, 709 (691 SE2d 402) (2010), *In the Interest of S. N. H.,* 300 Ga. App. 321, 327 (685 SE2d 290) (2009), *In the Interest of K. A. S.,* 279 Ga. App. 643, 650–651 (632 SE2d 433) (2006).

There was also sufficient clear and convincing evidence that the continued deprivation is likely to cause serious physical, mental, emotional or moral harm to the children. Although "it is not automatically true that a finding that deprivation is likely to continue will support a finding that continued deprivation will harm the child," *In the Interest of J. T. W.,* 270 Ga. App. 26, 37 (606 SE2d 59) (2004), in this case the juvenile court was authorized to conclude that the mother's failure to comply with the requirements of her case plan and failure, over an extended period of time, to get a job and stable housing, could cause harm to the children. In addition, evidence that the children were in a "foster to adopt home" and were doing well supports this finding. See *In the Interest of H. L. H.*, 297 Ga. App. 347, 350 (677 SE2d 396) (2009) ("Evidence that the mother failed to take the steps necessary for reunification, that the

4

foster parents have provided the child with a stable and secure home, and that they want to adopt the child[ren] . . . support[ed] a finding that the child would be harmed by further deprivation.").

Finally, the evidence presented at the hearings and discussed above supports the determination that termination of the mother's parental rights was in the children's best interest. "The same factors that show the existence of parental misconduct or inability may also support the juvenile court's finding that terminating the parent's rights would be in the child's best interest." *In the Interest of D. L.,* 268 Ga. App. 360, 360-361 (601 SE2d 714) (2004). The guardian ad litem and the CASA both recommended termination as being in the children's best interest. The court found that termination would be in their best interest because it would enable them to achieve stability and permanency. See *In the Interest of D. B.*, 306 Ga. App. 129, 139 (701 SE2d 588) (2010) (Children need permanency, stability, and a safe environment, which the mother failed to demonstrate that she could provide.). See also *In the Interest of A. R.*, supra at 710 ("The test in determining termination of parental rights, is whether the mother, *ultimately standing alone,* is capable of mastering and utilizing the necessary skills to meet her parenting obligations.").

Therefore, because the juvenile court's determination is supported by clear and convincing evidence on each of the above factors, I believe we must affirm the juvenile court's order terminating the mother's parental rights.