**SECOND DIVISION**
**ANDREWS, P. J.,**
**MCFADDEN and RAY, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**March 11, 2015**

# In the Court of Appeals of Georgia

A14A2175. IN THE INTEREST OF T. A., a child.

MCFADDEN, Judge.

The mother of T. A. appeals the termination of her parental rights, arguing that the evidence does not support the termination. She contends that the trial court erred in finding clear and convincing evidence that T. A.'s deprivation was likely to continue and that such deprivation would cause or was likely to cause serious physical, mental, or emotional harm to T. A. Although the mother met most of her case plan goals, the evidence of parental inability is sufficient to support the termination of her parental rights, and we must therefore affirm.

1. *Facts.*

On appeal from a juvenile court's order terminating parental rights, we view the evidence

in the light most favorable to the juvenile court's ruling, and our review is limited to addressing the question of whether any rational trier of fact could have found by clear and convincing evidence that the parent's rights should have been terminated. In this review, we must necessarily defer to the juvenile court's fact finding, weighing of the evidence, and credibility determinations.

*In the Interest of C. M.*, 325 Ga. App. 869, 869-870 (1) (756 SE2d 5) (2014) (citation and punctuation omitted).

Viewed in that light, the evidence shows that an authorization for shelter care for T. A. was filed on June 3, 2011, alleging that the mother had abandoned T. A. with a friend. A probable cause order granted temporary legal custody to the Department of Family and Children Services ("DFCS") based on the abandonment by the mother. T. A. was three years old at the time. Shortly thereafter, DFCS filed a deprivation petition. Following a hearing, the juvenile court held that T. A. was deprived based on numerous conditions, including the fact that the mother left T. A. overnight with a friend so that she could go to a nightclub and did not return in the morning to retrieve him. The friend also stated that the mother had physically abused T. A. and that she had witnessed a beating that resulted in a gash on T. A.'s head. In addition, an employee of a shelter where the mother previously lived stated that the

mother physically abused T. A., did not keep T. A. clean, and failed to provide food for T. A. The deprivation order was made final in January 2012, and DFCS was ordered to submit a case plan for the mother to include a requirement that she complete a comprehensive parental skills training program, cooperate with a parent aide to help apply those skills, have regular and frequent visits with T. A., participate in individual and group therapy, maintain stable housing sufficient for her and T. A., and maintain a stable income. Temporary custody of T. A. remained with DFCS.

The mother completed her case plan, with the exception of obtaining stable, clean and safe housing large enough for her and T. A. She attended counseling to help with her parenting skills and anger management and worked with a parent aide. For the most part, the mother was consistent with her visitation with T. A., but she was excessively late a few times and missed some visits entirely. The mother's income consists of supplemental social security.

The mother was evaluated twice for psychological and parental fitness. She has an IQ of 56, which is in the mild retardation range, and suffers from mild depression. The psychologist who evaluated her testified that the mother's limited cognitive abilities present a major risk factor in her ability to safely and successfully parent a

child or respond appropriately to emergencies. She testified that the mother would need 24-hour in-home support to raise T. A.

T. A. was referred for a psychological/developmental evaluation to consider whether he has an autism spectrum disorder. The psychologist who evaluated him determined that he exhibited signs and symptoms along the autism spectrum. T. A. has significant issues with his verbal and non-verbal communication, engages in repetitive play, has frequent temper tantrums over minor issues, and demonstrates an abnormal lack of fear. To thrive, T. A. would need a home where the parent would be able to provide substantial structure, routine, and consistency. The parent would need to be well-organized, have the ability to get T. A. to appointments, attend special education meetings, and understand T. A.'s special needs and how to apply strategies to address those needs in the home. According to the psychiatrist, it would be very difficult for a parent with a low IQ who cannot read to handle the challenges of a child with T. A.'s needs.

The parent aide who worked with the mother testified at a review hearing that the mother had not demonstrated that she could parent independently and that the mother needed constant reminders to keep the child within eyesight. She relayed an incident where T. A. almost ran into the street and the mother did not react until the

aide told her what to do. The parent aide testified that she would not be able to provide the type of support that the mother needed if T. A. were to return home.

Based on the facts outlined above, DFCS filed a petition for termination of parental rights on December 13, 2012. After conducting a hearing, the juvenile court terminated the mother's parental rights in an order filed on October 21, 2013.

2. *Sufficiency of the evidence*.

Former OCGA § 15-11-94 applies to this termination proceeding (a new Juvenile Code has been adopted and applies to all juvenile proceedings commenced on and after January 1, 2014). Former OCGA § 15-11-94 (a) provides that

> [i]n considering the termination of parental rights, the court shall first determine whether there is present clear and convincing evidence of parental misconduct or inability. . . . If there is clear and convincing evidence of such parental misconduct or inability, the court shall then consider whether termination of parental rights is in the best interest of the child, after considering the physical, mental, emotional, and moral condition and needs of the child who is the subject of the proceeding, including the need for a secure and stable home.

Pursuant to former OCGA § 15-11-94 (b) (4) (A), to determine parental misconduct or inability, the court must find that:

5

(i) The child is a deprived child, as such term is defined in [former] Code Section 15-11-2; (ii) The lack of proper parental care or control by the parent in question is the cause of the child's status as deprived; (iii) Such cause of deprivation is likely to continue or will not likely be remedied; and (iv) The continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child.

(a) *Deprivation.*

The juvenile court determined that T. A. was deprived because he lacked proper parental care and supervision as defined in former OCGA § 15-11-2 (8) (A). The mother has not challenged that finding on appeal.

(b) *Cause of the deprivation.*

The juvenile court concluded that the cause of T. A.'s deprivation was the mother's failure to provide adequate supervision and the mother's physical abuse of T. A. The mother has not challenged that finding on appeal.

(c) *The cause of the deprivation is likely to continue.*

The mother contends that the trial court erred by finding clear and convincing evidence that the deprivation would continue. She argues that she completed her case plan and that DFCS did not provide the specialized parenting classes that she needed to help her understand and care for T. A.'s disability.

6

The juvenile court's decision to terminate the mother's parental rights was not based on her failure to complete her case plan. In fact, the court specifically found that the mother "has completed all [case plan] goals with the exception of housing," but the mother's significant cognitive deficits left her "unable to incorporate what she has been offered in her case plan into her own understanding and abilities such that she is able to independently parent her child, who, because of his developmental issues, presents extraordinary parenting challenges."

Although the mother contends that DFCS should have provided her with specialized training to address T. A.'s disability, she has not pointed to any evidence that the specialized training would have enabled her to parent T. A. on her own. After completing her basic parenting classes, there was no change in the mother's ability to parent a child independently. And the state presented expert testimony that the mother would be unable to care for T. A. on her own without constant in-home support, something that DFCS is not obligated to provide. See *In the Interest of H. F. G.*, 281 Ga. App. 22, 26 (1) (635 SE2d 338) (2006). "The test in determining termination of parental rights, however, is whether the mother, *ultimately standing alone*, is capable of mastering and utilizing the necessary skills to meet her parenting obligations." *In the Interest of A. R.*, 302 Ga. App. 702, 710 (1) (c) (691 SE2d 402)

7

(2010) (citations and punctuation omitted; emphasis in original). The evidence does not show that the mother would be capable of parenting T. A. on her own or that she would have the in-home support that she would need to allow T. A. to return home. Thus, the trial court was entitled to infer from the evidence that the same conditions and causes of deprivation would continue if T. A. were reunited with his mother. See *In the Interest of A. R.*, 302 Ga. App. at 710 (1) (c); *In the Interest of H. F. G.*, 281 Ga. App. at 27 (1); see also *In the Interest of C. M.*, 325 Ga. App. at 872 (2) (a) (deprivation likely to continue where clear and convincing evidence supported juvenile court's finding that mother's intellectual ability was insufficient to enable her to parent her child safely and that mother was incapable of improving her parenting ability, given her intellectual limitations).

Moreover, the trial court was entitled to consider the mother's past conduct in determining whether the deprivation was likely to continue. *In the Interest of S. L. B.*, 265 Ga. App. 684, 688 (1) (595 SE2d 370) (2004). The fact that the mother had lost custody of an older child, who was only in her mother's care for the first two months of her life, "indicates that she would likewise be unable to care for [T. A.]." Id. (citation omitted).

(d) *Likelihood of harm*.

The mother contends that the trial court erred by finding clear and convincing evidence that T. A. was suffering harm or would probably suffer serious physical, mental, or emotional harm if the termination was denied. She argues that there is no evidence of a bond between T. A. and his foster parents, only general evidence of the harm caused to children by remaining in foster care, and no evidence that the bond between T. A. and his mother is detrimental.

T. A. has been in the care of DFCS for over three years. The juvenile court is "authorized to consider the adverse effects of prolonged foster care in determining that continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child." *In the Interest of R. D. B.*, 282 Ga. App. 628, 632 (1) (c) (639 SE2d 565) (2006) (citation and footnote omitted). And "[i]t is well settled that children need permanence of home and emotional stability or they are likely to suffer serious emotional problems." *In the Interest of C. T. M.*, 278 Ga. App. 297, 302 (2) (a) (iv) (628 SE2d 713) (2006) (citation and punctuation omitted).

Here, the juvenile court found that

[a] foster family placement, despite its good intentions, in many cases does not permit the kind of commitment and continuity that exist[s] with permanency. Foster homes can be more easily disrupted than permanent homes. Children who remain in foster care indefinitely will often

9

develop attachment disorders as they grow older, and because of continued instability, may even resort to delinquent or other anti-social behaviors. Prolonged but unplanned foster care, known as foster care drift, would therefore be harmful to this child.

The court relied upon expert testimony to reach these conclusions. Cf. *In the Interest of A. T.*, 271 Ga. App. 470, 473-474 (610 SE2d 121) (2005) (no expert testimony that permanency and a stable environment were important to children's well-being). The psychologist who evaluated T. A. testified that stability is crucial for T. A., including a stable residence, school, and primary caretaker. A lack of stability in these areas could create anxiety and confusion, which could stunt his development. The psychologist who evaluated the mother testified about the risk factors for children who move from foster home to foster home, and the fact that a lack of attachment can cause developmental problems. In addition, a DFCS caseworker testified that "foster care drift" is a possibility for T. A. because as long as he stays in foster care, he is subject to being moved to another placement.

There is also evidence that the mother's visits were detrimental to T. A. Her visits were initially scheduled for four times a month, but they were reduced to twice a month because T. A. regressed after the visits by acting out, not following direction,

and defecating on himself. When the mother did not show up for scheduled visits, T. A. became distraught.

Given the evidence showing that the mother's cognitive deficits prevent her from properly and safely parenting her child and T. A.'s established need for a stable home situation as well as the detrimental effects of prolonged foster care, a rational trier of fact could have found by clear and convincing evidence that the continued deprivation would likely cause serious physical, mental, emotional, or moral harm to the child. See *In the Interest of A. R.*, 302 Ga. App. at 711 (1) (d).

*Judgment affirmed. Andrews, P. J., and Ray, J., concur*.