**FIRST DIVISION**
**DOYLE, C. J.,**
**PHIPPS, P. J, and BOGGS, J.**

NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**September 22, 2015**

# In the Court of Appeals of Georgia

A15A0782. IN THE INTEREST OF C. J. V., et al., children.      DO-037

DOYLE, Chief Judge.

We granted the mother's application for discretionary review of a trial court order terminating her parental rights to eight-year-old C. J. V. and six-year-old F. N. R. After a thorough consideration of this case, including our review of the transcript of the termination hearing, which transcript was not available at the time we granted the mother's application, we have determined that the juvenile court's order was supported by clear and convincing evidence.[1] Accordingly, we find that the application for discretionary appeal was improvidently granted, and we dismiss the mother's appeal.

---

[1] See OCGA § 15-11-303 ("In all proceedings under this article, the standard of proof to be adduced to terminate parental rights shall be by clear and convincing evidence.").

This is the second time we have reviewed an order terminating this mother's parental rights. In *In the Interest of C. J. V.*,[2] a majority of this Court reversed the juvenile court's termination order, essentially finding that the juvenile court had improperly terminated the mother's parental rights based solely upon her poverty.[3] The evidence before this Court at that time showed that the mother was unemployed, frequently moved, and was at times dependent upon others for financial support.[4] Based upon the mother's shortcomings, the juvenile court terminated her parental rights.[5] We reversed on appeal, finding that the mother had completed the majority of her case plan goals, secured employment, and made two child support payments totaling $700.[6] We further noted the absence of "evidence of a verifiable mental or physical condition that indicates the mother is incapable of caring for the children."[7]

---

[2] 323 Ga. App. 283 (746 SE2d 783) (2013).

[3] See id. at 286-288.

[4] See id. at 284-285.

[5] See id. at 285.

[6] See id. at 284-285.

[7] Id. at 287.

Under the facts presented, we concluded that the mother's failure to fully comply with her case plan stemmed largely from her relative poverty.[8]

Following this Court's reversal, on July 23, 2013, the Department of Family and Children Services ("the Department") filed a deprivation petition alleging that (1) the mother was without income, (2) she tested positive for methamphetamine, and (3) she and the children were living in her father's two-bedroom trailer with inadequate space for the children. That petition was dismissed, however, after it was determined that the drug test was a false positive and that there was sufficient space for the children in the trailer.

On September 20, 2013, the Department filed another deprivation petition. Following a hearing, the juvenile court entered an order finding the children deprived and placed them in the custody of the Department. On November 8, 2013, the court entered a case plan requiring the mother to maintain stable housing and income for six months; pay child support; complete an in-person parent nurturing program; and undergo drug and alcohol assessment and complete any resulting recommended treatment. On February 26, 2014, the Department filed a petition to terminate the mother's parental rights.

_____

[8] See id. at 286-287.

At the final hearing held in May 2014, the Department presented the testimony of the children's foster mother, who, along with her husband, had cared for the children since July 2011. The foster mother testified that the children visited with the mother in September 2012 and then not again until August 2013. The same day the children were returned to their mother, she called the foster parents' home six to eight times, and within twenty-four hours, the mother returned the children to the foster parents, offering an arrangement wherein the boys would live with the foster parents and that she would visit them. The foster mother agreed, but later became concerned about the mother exercising visitation because the children were "total[ly] different" after their brief visit with the mother. C. J. V. became scared, refused to use the restroom alone, had two accidents at school, required a night light, and displayed aggression; F. N. R. began wetting the bed and had night terrors.

Brittan Hord, the Department supervisor assigned to the childrens' case testified that on the day in 2013 when the children were returned to their mother, the children were extremely upset and begging to return to the foster parents' home. The mother was two hours late to get the children, at which time they had already been returned to the foster parents. Hord retrieved them from the foster parents' home, and they had to be physically placed in the car. The mother reported that she was taking

4

the children to her father's home, where she lived. The mother had previously reported that her father had been physically and verbally abusive to her for her entire life, and law enforcement was regularly called to the home. Hord also testified that the mother had not secured stable independent housing for six months or longer since 2011, and she failed to consistently support the children during that time. Between August 2013 and the May 2014 final hearing, the mother lived in three different places: with her father; with her former girlfriend; and with her mother and mother's boyfriend. The mother did not have a job, but expected to receive disability, although she was unable to explain the basis of her disability.

The mother's psychologist testified that the mother's overall IQ is 57; she does not understand complex sentences or concepts; she reads at a second grade level and her sentence comprehension is at a first grade level; she has difficulty comprehending medical or academic instructions regarding the children; she is unable to provide emotional stability and support for her children; she is unable to perceive problems with her children; she is prone to uncontrolled anger reactions; she has low empathy; the children will soon pass her developmentally; she is unable to provide food, shelter, clothing, or education for her children; and she functions at the level of an eight-year-old.

Based upon the evidence presented, the juvenile court again entered an order terminating the mother's parental rights. The court noted that both the Court Appointed Special Advocate and the Guardian Ad Litem recommended termination, and it noted that "[t]he children are in a foster to adopt home where they have been for nearly three years [and] are doing very well." In the termination order, the trial court stated:

> When the court entered the most recent adjudicatory order, the mother stated that she wanted more time to complete her case plan and gain stability to be able to provide for her children. Today she testified that she wants more time. It has been two years [and] ten months since these children first entered care. It is unfortunate that although it is obvious the mother loves her children, she is simply not capable of maintaining the stability to provide for them. The results of her psychological evaluation, combined with her repeated bad decisions, make it patently obvious that she is incapable. . . . Simply put, this mother is not capable of understanding what it is she needs to do to provide even the basic necessities for these children, let alone meet their emotional, educational, and social needs. It is sad, but a fact that she is of low IQ and functions on the level of an eight year old child, which, in the opinion of an expert[,] renders her incapable of parenting children. Meanwhile, the children, ages five and seven, have been required to remain in care for nearly three years. [F. N. R.] was just over two years of age when he was removed from his mother's home. He is now five years [and] five months of age. . . . The court has been unable to allow

6

the mother even supervised visitations because any contact with their mother is so detrimental to the children's well-being and behavior.

Following entry of the order, the mother filed an application for discretionary appeal, which this Court granted.

1. The mother argues that there was insufficient evidence to support the termination. We disagree. The evidence adduced at the hearing following our reversal of the first termination order supports the trial court's order. Any strides that the mother had made pertaining to her case plan were temporary. After making two child support payments, the mother has paid no additional support, and she failed to secure stable housing. Although the mother regained custody of her children, she returned them 12 hours later and suggested that they live with the foster parents. Finally, the mother's mental limitations preclude her from successfully parenting her children. All of these facts support the juvenile court's order terminating the mother's parental rights.[9]

_____

[9] See OCGA § 15-11-310 ("(a) In considering the termination of parental rights, the court shall first determine whether one of the following statutory grounds for termination of parental rights has been met: (1) The parent has given written consent to termination which has been acknowledged by the court or has voluntarily surrendered . . . her child for adoption; (2) The parent has subjected . . . her child to aggravated circumstances; (3) The parent has wantonly and willfully failed to comply for a period of 12 months or longer with a decree to support . . . her child that has

2. The mother also contends that the trial court's termination is "insufficient" because it failed to find that the children were dependent as required by OCGA § 15-11-310 (a) and OCGA § 15-11-320 (a). We find no basis for reversal.

In 2013, the General Assembly amended Title 15 of the Georgia Code "so as to substantially revise, supersede, and modernize provisions relating to juvenile proceedings and enact comprehensive juvenile justice reforms recommended by the Governor's Special Council on Justice Reform in Georgia." Ga. Laws 2013, Act 127. And as part of that statutory overhaul, the General Assembly amended the definitions applicable to juvenile proceedings. See Ga. Laws 2013, Act 127, § 1-1; see also OCGA § 15-11-2 (codification of new definitions for juvenile proceedings). Effective January 1, 2014, the new definitions contained

---

been entered by a court of competent jurisdiction of this or any other state; (4) A child is abandoned by his . . . parent; or (5) A child is a dependent child due to lack of proper parental care or control by his . . . parent, reasonable efforts to remedy the circumstances have been unsuccessful or were not required, such cause of dependency is likely to continue or will not likely be remedied, and the continued dependency will cause or is likely to cause serious physical, mental, emotional, or moral harm to such child. (b) If any of the statutory grounds for termination has been met, the court shall then consider whether termination is in a child's best interests after considering the following factors: (1) Such child's sense of attachments, including his . . . sense of security and familiarity, and the continuity of affection for such child; (2) Such child's wishes and long-term goals; (3) Such child's need for permanence, including his . . . need for stability and continuity of relationships with a parent, siblings, and other relatives; and (4) Any other factors, including the factors set forth in [OCGA §] 15-11-26, considered by the court to be relevant and proper to its determination. . . ."). See also *In the Interest of T. A.*, 331 Ga. App. 92, 97 (2) (769 SE2d 797) (2015) (applying former OCGA §§ 15-11-94 & 15-11-2 (8) (A)).

in OCGA § 15-11-2 became applicable to juvenile proceedings commenced on and after that date. Ga. Laws 2013, Act 127, § 5-1 ("This Act shall become effective on January 1, 2014, and shall apply to all offenses which occur and juvenile proceedings commenced on and after such date."). The former definitions used the term "deprived" to mean a child who was "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals." See Former OCGA § 15-11-2 (8) (A). But the new definitions refer to a child as "dependent," rather than "deprived," which is a child who . . . "[h]as been abused or neglected and is in need of the protection of the court." OCGA § 15-11-2 (22) (A). "Neglect" is then defined to mean . . ."the failure to provide proper parental care or control, subsistence, education as required by law, or other care or control necessary for a child's physical, mental, or emotional health or morals." OCGA § 15-11-2 (48) (A).[10]

The petition in this case was filed in February 2014. Thus, in order to terminate the mother's parental rights in this case, the trial court was required to find the children dependent, rather than deprived.[11] Nevertheless, in its final order, the trial court found the children to be deprived. Given the similarities in the two definitions

---

[10] (Punctuation omitted.) *In the Interest of G. R. B.*, 330 Ga. App. 693, n. 1 (769 SE2d 119) (2015).

[11] See OCGA § 15-11-310 (a) (5).

and the fact that evidence supported a finding of dependency as defined by OCGA § 15-11-2 (22) (A), we find no basis for reversal.

We granted the mother's application for discretionary review without the benefit of the full appellate record, including the transcript of the termination hearing; however, because the record supports the order of the court below, we conclude that the application for discretionary appeal was improvidently granted. Accordingly, the order granting the mother's application is vacated, and her appeal is hereby dismissed.[12]

*Appeal dismissed. Phipps, P. J., and Boggs, J., concur.*

---

[12] See, e. g., *Killian v. State*, 315 Ga. App. 731, 732 (728 SE2d 258) (2012); *Mosley v. Georgia Peace Officer &c.*, 217 Ga. App. 798 (458 SE2d 503) (1995).