**FIFTH DIVISION**
**ELLINGTON, P. J., MCFADDEN, P. J.**
**and RAY, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**June 28, 2018**

# In the Court of Appeals of Georgia

A18A0304. STEWART v. McDONALD.

MCFADDEN, Presiding Judge.

Robert J. Stewart filed this lawsuit against attorney Gus McDonald for legal malpractice, among other things. Stewart claimed that, as a result of that malpractice, he had suffered financial loss in connection with the 2010 sale of a business which he had formed in 2001 with Chip Smith. A Rabun County jury returned a $392,000 verdict in favor of Stewart, but the superior court granted McDonald's motion for judgment notwithstanding the verdict. Stewart appeals from that order as well as the trial court's grant of McDonald's motion for a directed verdict on Stewart's other claims.

Because Stewart presented evidence to create a jury question on his claim of legal malpractice, the trial court erred in granting McDonald's motion for judgment

notwithstanding the verdict on the claim. Any error in the grant of a directed verdict on Stewart's breach of fiduciary duty and fraud claims, which duplicate the legal malpractice claim, was harmless, given our reversal of the grant of the motion for judgment notwithstanding the verdict on the malpractice claim. Finally, the jury should have been allowed to consider Stewart's claims for attorney fees and punitive damages. So we reverse the judgment and remand the case with direction.

1. *Factual background.*

In his complaint, Stewart asserted claims against McDonald for, inter alia, fraud, breach of fiduciary duty, and legal malpractice. He sought compensatory damages, punitive damages, and attorney fees. Stewart claimed that his lawyer, McDonald, conspired with Stewart's business partner, Chip Smith, to defraud him out of his "fair share of the proceeds of the sale of a company that Stewart and Smith jointly owned." Stewart asserted that McDonald's negligence damaged him by depriving him of economic benefits that he was entitled to by virtue of his "equal ownership" position in the company. McDonald denied these claims, arguing at trial that he was not Stewart's lawyer, that he only agreed to help Stewart and Smith reduce to paper a sale that the two had already negotiated with the company's buyer, and that he did not cause any of Stewart's alleged damages.

2

During the trial, the trial court granted McDonald's motion for a directed verdict on all but Stewart's legal malpractice claim. After the jury returned a verdict for $392,000 in Stewart's favor, the trial court granted McDonald's motion for a judgment notwithstanding the verdict based on its determination that Stewart had failed to present evidence that McDonald's negligence was the proximate cause of his claimed damages. For the following reasons, we disagree.

> On appeal from a trial court's rulings on motions for directed verdict and judgment notwithstanding the verdict, we review and resolve the evidence and any doubts or ambiguities in favor of the verdict; directed verdicts and judgments notwithstanding the verdict are not proper unless there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, demands a certain verdict.

*Vol Repairs II v. Knighten*, 322 Ga. App. 416, 417 (745 SE2d 673) (2013) (citations and punctuation omitted). So viewed, the record shows as follows.

*Stewart and Smith form CES.* In 1996, Smith worked as the fitness director at the Atlanta Athletic Club and he had a side business training athletes. Smith approached Stewart about working with him as a strength trainer, and he offered him a position at the Atlanta Athletic Club. The two later left the Atlanta Athletic Club and, in 2001, formed Competitive Edge Sports, LLC ("CES"). The company's

3

operating agreement provided that Smith had a 51 percent, controlling interest in the company and that Stewart owned the remaining 49 percent.

CES's operating agreement did not address whether CES, Smith, or Stewart owned any intellectual property. At trial, Smith testified that he was the sole owner of the intellectual property used by CES. He elaborated that he created and continuously owned all of the intellectual property used by CES, including a logo, a unique training system, a training manual, and various pieces of athletic equipment. Smith presented evidence showing that at some point, he obtained patents, trademarks, and copyrights in the intellectual property.

Stewart, however, testified at trial that everything used in the business — including the intellectual property — belonged to CES. Stewart introduced evidence that the agreed 51-49 split was intended to reflect a fair allocation of the value of the company, based on his and Smith's complimentary efforts and contributions, including Smith's contribution of the company's logo. He explained that although he and Smith each had developed his own training system prior to forming CES, when they "got together, all of that changed and became a whole new system with both parts being added into it." He testified that while they were operating CES, there were no patents or trademarks; that they had used their logo from the beginning,

4

although they refined it over time; and that they and their staff jointly wrote the training manuals that Smith ultimately turned into a copyrighted book.

In 2007, CES was having financial difficulties, and Smith and Stewart began looking for ways to improve the company's cash flow. They spoke with two businessmen about franchising CES and its training methods. The businessmen testified at trial that they were assured by both Smith and Stewart that Smith was the sole owner of the intellectual property used by CES. Stewart, however, denied saying that he had no interest in any of CES's intellectual property. He explained that, because the costs of constructing weight rooms made it too expensive to license the weightlifting component of the program, which was Stewart's speciality, the discussions concerned only the running component of the CES training program, Smith's speciality. In any event, Smith and Stewart abandoned the negotiations and decided to pursue a sale of CES instead.

*CES Holdings acquires CES.* Shortly after ending the franchising negotiations, Smith and Stewart struck a deal with Todd Robison, an international business consultant, to get the funds necessary to keep the company operating. Robison testified that he organized a group of investors to purchase CES outright from Smith and Stewart through a company that he had formed for that purpose, CES Holdings.

5

Robison's immediate goal was to provide CES Holdings with an infusion of operating capital. Thereafter, he would find other investors to acquire CES Holdings from the investors who bought CES.

On September 8, 2008, CES Holdings entered into a binding letter of intent with CES for the asset acquisition and purchase of CES, a document signed by both Smith and Stewart. The letter of intent expressly provided that the terms outlined in the agreement "are binding" on both parties and that they would be memorialized in a forthcoming "Definitive Agreement." The parties also agreed that the attorney acting as "outside advisor" concerning the sale, Chad Speck, represented all parties to the agreement and that all parties acknowledged, consented to, and waived any conflict of interest that counsel had with the parties.

In the 2008 agreement, CES Holdings promised to assume CES's debts and to pay Stewart and Smith $100,000 each for their membership interest in the company, to be paid in installments. CES Holdings retained Smith and Stewart as independent contractors and promised to pay them a salary, benefits, and other compensation, including 20 percent of the profits of CES Holdings. Both Stewart and Smith were also given the option to buy equity positions in CES Holdings. The 2008 agreement between CES and CES Holdings did not address the ownership of any intellectual

6

property, other than to note that CES Holdings would continue to purchase any equipment invented by Smith. Robison testified that the 2008 agreement was silent on the issue of ownership of intellectual property because he had determined that Smith, not CES, owned all of the intellectual property relevant to the transaction.

The 2008 agreement did, however, address intellectual property as it pertained to licensing agreements. It provided that all existing licensing agreements between CES Holdings and CES would be void and that only those licensing agreements that either Smith or Stewart entered into with CES Holdings would remain in effect. CES Holdings later entered into a separate licensing agreement with Smith for the use of intellectual property, including the CES logo, equipment, the training system, and written materials. Smith also purchased a 10 percent equity position in CES Holdings, which was memorialized in a separate agreement as well. Defendant McDonald was not involved in negotiating or drafting any of these agreements.

*CES Performance acquires CES Holdings.* While Robison looked for investors to acquire CES Holdings, CES Holdings made the agreed installment payments to Smith and Stewart for their membership interests in CES and began retiring CES's debts. Robison, as the chief executive officer of CES Holdings, offered to sell the company to a group of Texas investors in exchange for $3 million.

In late 2009, after a series of negotiations between Robison and the Texas investors, CES Performance ("CESP") was created to acquire CES Holdings. CESP agreed to assume and ratify all of the contractual obligations of CES Holdings. Robison sold his shares in the company and "exited the picture." Shortly thereafter, CESP's attorney began drafting the definitive agreements memorializing the sale of CES to CESP in accordance with the terms his client gave him. He did not complete drafting the documents, as he was informed that McDonald would be taking over.

In 2009, before McDonald's involvement, Smith renegotiated his employment contract with CESP. Smith testified that he also spoke with Todd Leake, the chief executive officer of CESP, in January 2010 concerning the definitive agreement with CESP and the terms of his compensation. Smith said that, since he was still owed money from CES Holdings for licensing fees and equipment sales, he asked Leake to modify his definitive agreement to compensate him with additional CESP stock in lieu of the money owed. An April 8, 2010 email from CESP's attorney to McDonald confirmed that

> CES Performance and [Smith] have been negotiating issues relating to [Smith's] compensation, license agreements, and equipment sales. In those negotiations, CES Performance has agreed to grant [Smith] a 10 percent equity interest in the company. The 10 percent granted to

8

[Smith] in these negotiations plus the effective 10 percent he owns through CES Holdings Corp brings his effective ownership to 20 percent.

Ultimately, the CESP-Smith agreement (which was drafted by McDonald) granted Smith equity in CESP "as incentive . . . for his knowledge, skill and contributions. . . ." Stewart was granted no equity in CESP and did not know that Smith had been granted equity. Further, upon CESP's acquisition of the company, Smith received $500,000 more than Stewart.

In sum, just prior to McDonald's involvement in 2010, CESP, as the successor to CES Holdings, intended to complete the purchase of CES, but the terms of the purchase had not been finalized. CESP's attorney had begun drafting the documents to accomplish the purchase, but then McDonald took over.

*McDonald enters the transaction.* McDonald met Smith and Stewart through CES, which provided athletic training services to McDonald's son, a high school football player. In 2009, McDonald had helped CES deal with an employee who had embezzled company funds. McDonald had had no formal, written engagement agreement with CES concerning the embezzlement matter; rather McDonald agreed

to trade his legal services to the company for nine "free" athletic training sessions for his son.

Later, in early April 2010, McDonald agreed to help facilitate the transaction with CESP at the request of Smith and CESP. McDonald testified that Smith and Stewart had already struck a deal to sell their company but that they and CESP needed help moving "the transaction forward" by "basically handing things around to get signed." (Stewart denied that the terms of the deal had been finalized.) McDonald testified that he did not negotiate the terms of the deal; rather, he helped reduce the deal to writing using terms provided to him by the parties to the agreement. McDonald testified that he had understood his assignment to be one of assistant scrivener and messenger who was "doing a favor for friends." McDonald testified that he had no engagement letter with Smith, Stewart, or CESP, and that he was not compensated for these services in money or trade. CESP's lawyer testified that he had already received the terms of the transaction from his employer and had prepared drafts of the definitive agreements before McDonald was asked to help expedite the closing. An April 15 email from CESP to its lawyer shows that McDonald had agreed to "finish the paperwork pertaining to Chip Smith and CES."

Stewart, on the other hand, testified that he believed that McDonald did represent him and was negotiating on his behalf. He testified that, with respect to the 2010 transaction, he had assumed that McDonald was his lawyer because "[Smith] told [him] that [McDonald] would represent [them]." He further testified that, although he could not remember the exact words or whether the discussion was in person or over the telephone, he believed that McDonald had said as much to him as well. He testified that McDonald sent him no bill for his services; rather, he assumed that McDonald would be paid as he had been in the past, with free athletic training sessions for his son. Stewart did not know when McDonald got involved in the transaction or the extent to which he was involved in drafting the definitive agreements. He testified: "At that time[,] whenever it happened, I had no clue to anything that had transpired."

The record shows that, in early April 2010, McDonald received a number of draft documents from CESP's attorney and began reviewing them. McDonald testified that, before he received the documents, he was not familiar with how Smith and Stewart's "business was organized or what was going on [with respect to the transaction]." But, after reviewing the documents, McDonald saw that CESP had dealt with Smith and Stewart differently. CESP's draft documents, which included

11

an "Acknowledgment and Release" dated February 2010, showed that Stewart was being released from his employment with CESP pursuant to the 2008 agreement and that he would be paid the final $50,000 installment owed to him for his 49 percent membership interest in CES. The documents also showed that Smith was still owed a $50,000 installment for his 51 percent ownership interest in CES as well as outstanding amounts for equipment sales and license fees. Moreover, the documents revealed that Smith was a shareholder in CES Holdings and that he would remain a shareholder in CESP with a 20 percent equity stake. Stewart, on the other hand, had no equity position in CES Holdings and had not taken advantage of the opportunity to buy stock, as Smith had done.

McDonald testified that, after meeting with Stewart, he was left "scratching [his] head" because, although the documents he reviewed showed that Stewart had sold his membership interest in the company in 2008, Stewart did not seem to understand what that meant. McDonald testified that he believed that Stewart had a fundamental misunderstanding about what he did and did not own and that he had confused his right to a share of the profits going forward with an equity stake in CES Holdings. At this point, McDonald did not tell Stewart that he should retain an attorney to advise him on what had transpired in 2008 and how that sale affected the

12

instant transaction. Nor did he explain to Stewart that he did not represent him in the transaction and that his role was limited to facilitating the closing by drafting and delivering documents. Instead, McDonald engaged in the following conduct.

At Stewart's request, McDonald called his contacts at CESP and asked: "[W]ill y'all give [Stewart] some stock?" He told Stewart that they said "no" because "[t]hey were reluctant to revise the agreement." Stewart testified that McDonald falsely told him that CESP was not granting equity to *anybody*, although in fact, as noted, the CESP-Smith agreement (drafted by McDonald) had granted Smith equity in CESP "as incentive . . . for his knowledge, skill and contributions. . . ." McDonald also negotiated Stewart's five-year employment contract with CESP and was able to obtain a salary increase for him.

Stewart testified that, based on these representations and concessions, he signed the closing document, which was styled as an "Agreement, Release and Indemnification Between Robbie Stewart and CES Performance, LLC."

The record shows that, after Stewart signed the agreements and began working for CESP, he voiced no objection to the terms of the transaction for three years. Stewart testified that he did not discover that he and Smith had been treated differently in the transaction until 2013, when CESP and Smith became embroiled in

13

a dispute and Leake informed Stewart of the details of Smith's agreement with the company.

In his appellate brief, Stewart contends that McDonald's negligence directly cost him $735,000. He argues that he was entitled to 49 percent of the total proceeds of the sale of the company, not just the cash amount he was to be paid pursuant to the 2008 agreement. Specifically, he claims that Smith got an additional $500,000 pursuant to a licensing agreement and a 20 percent equity stake in CESP, compensation that Stewart contends he would have shared had McDonald been acting as his advocate.

2. *Legal malpractice.*

Stewart contends the trial court erred in granting McDonald's motion for judgment notwithstanding the verdict on his legal malpractice claim because the record shows that he presented sufficient evidence, though disputed, on each of the essential elements of that claim and that the evidence did not demand a verdict in McDonald's favor. We agree.

> In a legal-malpractice case, a plaintiff has the burden of proving the three elements of such an action: (1) employment of the defendant attorney (i.e., the plaintiff had an attorney-client relationship with the attorney); (2) failure of the attorney to exercise ordinary care, skill, and

14

diligence; and (3) that the attorney's negligence was the proximate cause of the plaintiff's damages.

*Estate of Nixon v. Barber*, 340 Ga. App. 103, 105 (1) (796 SE2d 489) (2017) (footnote omitted) .

(a) *Attorney-client relationship.*

With respect to the first element, attorney-client relationship,

[i]t is generally held that an attorney-client relationship must be demonstrated before a plaintiff may recover in a legal malpractice suit. This is essential in establishing the element of duty that is necessary to every lawsuit based upon a theory of negligence. Though an attorney-client relationship generally is a matter of express contract, it may be implied from the conduct of the parties. The employment is sufficiently established when it is shown that the advice or assistance of the attorney is sought and received in matters pertinent to his profession. Moreover, while the payment of a fee is relevant to the inquiry and may in some circumstances be controlling, an attorney-client relationship may be found to exist where no fee is paid, and the payment of a fee does not necessarily demonstrate the existence of the relationship. All that is necessary is a "reasonable belief" on the part of the would-be client that he or she was being represented by the attorney. A reasonable belief is one which is reasonably induced by representations or conduct on the part of the attorney.

15

*Cleveland Campers, Inc. v. R. Thad McCormack, P.C.*, 280 Ga. App. 900, 903 (2) (635 SE2d 274) (2006) (footnotes and punctuation omitted).

Under the circumstances here, it was reasonable for Stewart to believe that McDonald was his lawyer and was providing legal advice to him concerning the sale of his interest in CES. As noted above, McDonald spoke with CESP on Stewart's behalf concerning a key term of the sale, Stewart's compensation. And he advised Stewart that the terms of the sale in its current form was the best deal available to him. The record supports a finding that Stewart sought and received McDonald's legal advice concerning the sale of his membership interest in CES; thus, Stewart presented sufficient evidence concerning the existence of an attorney-client relationship between himself and McDonald to survive a directed verdict or a motion notwithstanding the verdict. See, e.g., *Mays v. Askin*, 262 Ga. App. 417, 419-20 (1) (585 SE2d 735) (2003) (An attorney's failure to document non-representation in writing, coupled with the giving of some advice, gave rise to a jury question on the issue of whether a relationship existed and thus, a duty owed to the client.); *Calhoun v. Tapley*, 196 Ga. App. 318, 319 (395 SE2d 848) (1990) (The evidence, though disputed, was sufficient for a jury to find that an attorney-client relationship had been formed, even without the payment of a fee, where the attorney freely discussed the

16

case with the client, answered all of the client's questions, never told the client that he could not discuss the matter because he did not represent her, and never advised her to retain another lawyer.).

(b) *Breach of duty of care*.

Stewart also presented sufficient evidence concerning the second element of his claim for legal malpractice, that is, whether McDonald breached his duty of care to him. As Stewart's attorney, McDonald owed him a duty to "exercise ordinary care, skill and diligence." *Allen v. Lefkoff, Duncan, Grimes & Dermer, P.C.*, 265 Ga. 374, 375 (2) (a) (453 SE2d 719) (1995) (citations omitted). More specifically,

> the law imposes upon persons performing professional services the duty to exercise a reasonable degree of skill and care, as determined by the degree of skill and care ordinarily employed by their respective professions under similar conditions and like surrounding circumstances.

Id. (citations, punctuation, and emphasis omitted).

In this case, Stewart presented ample evidence, including expert opinion testimony, from which the jury could find the requisite breach of duty. Most fundamentally, the record shows that McDonald admitted that he did not perform the duties of counsel on Stewart's behalf because he did not believe that he was Stewart's

17

counsel. McDonald testified that he drafted the definitive agreements exactly as CESP told him to and that he was not trying to negotiate for Stewart. Further, he admitted that he did not tell Stewart that Smith had stock in the new company. Indeed, email communications between McDonald and the parties show that McDonald was behaving like an intermediary between parties who had often conflicting interests and not as Stewart's attorney. Stewart's expert testified that this behavior constituted malpractice because McDonald was "not advocating for his client."

By failing to act as Stewart's attorney, McDonald ignored core obligations that a lawyer owes a client. An attorney's fiduciary duty to his client requires the attorney "to show loyalty, to exercise the utmost good faith, to apply his best skill, zeal, and diligence in representing him, and to avoid interests or actions that [are] incompatible with [the client's]." *Tunsil v. Jackson*, 248 Ga. App. 496, 499 (2) (546 SE2d 875) (2001) (footnote omitted).

Given the evidence, the jury was authorized to find that McDonald breached his duty of care to Stewart. See *Traub v. Washington*, 264 Ga. App. 541, 543-544 (1) (591 SE2d 382) (2003) (A jury issue existed as to whether an attorney committed

18

legal malpractice when he allegedly represented multiple clients after conflicts arose and he took action adverse to a client.).

(c) *Causation and damages*.

When we view this evidence and the deductions drawn from it in favor of the verdict, as we must, *Dept. of Transp. v. Blair*, 220 Ga. App. 342, 344 (1) (469 SE2d 446), 449 (1996), the evidence authorized the jury to conclude that Stewart did not receive 49 percent of the proceeds realized from the sale to CESP and to conclude that the difference between what he and Smith received was not attributable to intellectual property owned by Smith, because the intellectual property was owned by CES, not Smith individually. The jury could further conclude that this unfavorable outcome was the result of McDonald's failure to fulfill his duties to Stewart and that had he done so, the proceeds from which Stewart's share was calculated would have been greater.

A judgment notwithstanding the verdict is "not proper unless there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, demands a certain verdict." *Blair*, 220 Ga. App. 345 (1). Stewart presented evidence creating conflicts on the issues of causation and damages. Accordingly, the issues were properly submitted to the jury for resolution

19

and the trial court erred by granting McDonald's motion for judgment notwithstanding the verdict. Compare *Szurovy v. Olderman*, 243 Ga. App. at 453 (Because the plaintiff failed to show that her attorney could have negotiated a better agreement, she failed to establish damages and proximate cause. Therefore, as a matter of law, her claims of damage were speculative.).

3. *Breach of fiduciary duty and fraud*.

Stewart contends that the trial court erred in granting McDonald's motion for a directed verdict as to Stewart's claims for fraud and breach of fiduciary duty. Any error in this regard was harmless.

Stewart's claims for damages for fraud and breach of fiduciary duty are factually based upon McDonald's breach of his fiduciary duties to Stewart in the performance of his duties as a lawyer, so the claims are duplicative of Stewart's legal malpractice claim. See, e.g., See *McMann v. Mockler*, 233 Ga. App. 279, 281-282 (3) (503 SE2d 894) (1998); *Griffin v. Fowler*, 260 Ga. App. 443, 446 (1) (579 SE2d 848) (2003). Compare *Both v. Frantz*, 278 Ga. App. 556, 559 (2) (629 SE2d 427) (2006) (fiduciary duty claim not merely duplicative of legal malpractice in the event the jury finds no evidence of attorney-client relationship). Any trial court error in granting McDonald a directed verdict on Stewart's alternative but duplicative claims was

20

harmless, given our reversal of the grant of the judgment notwithstanding the verdict on the legal malpractice claim. *Starks v. Robinson*, 189 Ga. App. 168, 170 (3) (375 SE2d 86) (1988) (any error in directing verdict was harmless without showing that plaintiff was otherwise jeopardized). See also *Bibbs v. Toyota Motor Corp.*, __ Ga. __, __ (3) (__ SE2d __) (Case No. S18Q0075, decided June 18, 2018) (where damages overlap, a double recovery is impermissible). *Compare Long v. Marion*, 182 Ga. App. 361 (355 SE2d 711) (1987) (physical precedent only) (damage award for breach of contract and fraud was not double recovery because alleged fraud involved matters other than matters connected to consent to contract).

4. *Attorney fees*.

Stewart contends that the trial court erred in granting McDonald's motion for a directed verdict on his claim for attorney fees pursuant to OCGA § 13-6-11. We agree. "The evidence . . . could support a jury finding that [McDonald's] persistent failure to adequately represent [Stewart] went beyond mere negligence and rose to the level of bad faith in dealing with [him]." *Brito v. Gomez Law Group, LLC*, 289 Ga. App. 625, 629 (658 SE2d 178) (2) (b) 183 (2008). The trial court erred by removing this issue from the jury.

5. *Punitive damages.*

Stewart contends that the trial court erred in granting McDonald's motion for a directed verdict on his claim for punitive damages. We agree. Under OCGA § 51-12-5.1 (b), "punitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." "A breach of fiduciary duties is sufficient to support an award of punitive damages." *Kahn v. Britt*, 330 Ga. App. 377, 392 (8) (765 SE2d 446) (2014) (citation omitted). As noted in Division 3, supra, Stewart's "legal malpractice claim . . . is based on the establishment of a fiduciary, attorney-client relationship that [was] breached." *Griffin*, 260 Ga. App. at 446 (1)."Whether punitive damages should be awarded for a breach of fiduciary duties is ordinarily a question for the jury." *Kahn*, 330 Ga. App. at 392 (8) (citation omitted). Since Stewart introduced evidence that created issues for jury resolution on his legal malpractice claim based on a breach of fiduciary duty, then the evidence likewise created issues for jury resolution on his punitive damages claim.

*Judgment reversed and case remanded with direction. Ray, J., concurs in the judgment only. Ellington, P. J., concurs in Divisions 1, 2 (a), 2 (b), and 3, and dissents in Divisions 2(c), 4, and 5\**

**\*THIS OPINION IS PHYSICAL PRECEDENT ONLY. COURT OF APPEALS RULE 33.2.**

A18A0304. STEWART v. McDONALD

Ellington, Presiding Judge.

Respectfully, I dissent to Divisions 2 (c), 4, and 5 of the majority opinion. I agree that the evidence adduced at trial was sufficient for a jury to find the existence of an attorney-client relationship and a breach of the attorney's duty of care. However, I believe that whether McDonald could have obtained a better deal for Stewart under these circumstances is fatally speculative. The record shows that CESP treated Stewart and Smith differently in 2010 because the two actually owned different interests by then. They were not, as Stewart argues, negotiating "over one pot" when McDonald got involved in the transaction. Given the evidence presented, the superior court was correct in determining that Stewart failed to show that McDonald's malpractice was the proximate cause of his claimed damages.

As we have held, "proof that the attorney's negligence proximately caused the client's harm is necessary for recovery. A claim for legal malpractice is sui generis insofar as the plaintiff's proof of damages effectively requires proof that he would have prevailed in the original litigation." (Citation omitted.) *Oehlerich v. Llewellyn*, 285 Ga. App. 738, 739-740 (647 SE2d 399) (2007). Or, as is more pertinent to

business transactions like those of the instant case, the plaintiff must demonstrate that "but for the attorney's error, the outcome would have been different; any lesser requirement would invite speculation and conjecture." (Citations and punctuation omitted.) *Szurovy v. Olderman*, 243 Ga. App. 449, 451 (530 SE2d 783) (2000). See also *Whiteside v. Decker, Hallman, Barber & Briggs*, 310 Ga. App. 16, 18-19 (1) (712 SE2d 87) (2011) ("To establish proximate cause, a [tort] plaintiff must show a legally attributable causal connection between the defendant's conduct and the alleged injury[, and] must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result.") (citation and punctuation omitted). As the facts set forth below show, the superior court properly concluded that Stewart failed, as a matter of law, to carry his burden of presenting evidence that demonstrated a reasonable basis for inferring that his claimed damages proximately flowed from McDonald's malpractice. I disagree with the majority's recitation of the relevant facts in two key respects. First, Stewart failed to present any evidence – other than his own assumptions – that the intellectual property used by CES was in fact the property of CES. Second, when CESP acquired CES Holdings in 2010, Stewart had already sold his interest in CES.

2

That CES's operating agreement was silent on the issue of intellectual property is some evidence that it owned none. Morever, Smith and several witnesses testified that Smith was the *sole* owner of the intellectual property used by CES. Smith testified that he had been training athletes since the 1980s using a system that he had developed prior to meeting Stewart a decade later. He testified that he created and had continuously owned all of the intellectual property used by CES, including a logo, a unique training system, a training manual, and various pieces of athletic equipment. Smith also presented documentary evidence showing that he holds patents, trademarks, and copyrights in his intellectual property. Stewart did not contend that he personally owned any intellectual property and he presented no evidence from which a jury could infer such ownership. Rather, his trial testimony shows only that he *assumed* that any intellectual property used in the business belonged to CES. The record also shows that Stewart did not tell McDonald or anyone with CES Holdings or CESP that he was entitled to share in the value of Smith's intellectual property or that the payment that he had already received for his share of CES did not adequately take into account the value of any intellectual property.

More significantly, even if the value of CES included the value of intellectual property owned by the company, the record plainly shows that Stewart sold his

3

membership interest in CES to CES Holdings in 2008 for $100,000. Stewart testified that he understood that this transaction was a sale of his membership interest in CES and that, as a result of the sale, he no longer held an equity interest in CES. Instead, he was a contract employee of CES Holdings. The 2008 letter of intent that Stewart presumably read before he signed expressly provided that the material terms outlined in the agreement "are binding" on the parties and that they would be memorialized in a forthcoming "Definitive Agreement." And, finally, on October 1, 2008, CES amended its articles of incorporation to reflect that CES Holdings was now the sole member of the company.[1] Given these facts, I disagree with the majority's characterization of the sale of Stewart's interest in CES as one that was not yet final when McDonald got involved.

The record also does not support a finding that CESP paid Stewart an additional $500,000 for his membership interest in CES. That $500,000 was for a multi-year licensing agreement that Smith entered into with CES Holdings *after*

---

[1] When CESP acquired CES Holdings, the equity positions in the company were reallocated based on the amounts invested by the Texas investors and by those who already held shares in CES Holdings (one of whom was Smith, who was by then a director and shareholder with a 28.18 percent ownership interest in CES Holdings.) Stewart had no equity stake in CES Holdings. After adjusting for the financial contributions of the new investors, Smith had a 10 percent equity stake in CESP.

Stewart had sold his interest in CES. And the additional 10 percent equity stake that Smith acquired from CESP in 2010 was for compensation in lieu of the money still owed to him under that very licensing agreement.

In summary, what this record shows is that Stewart and Smith were paid the same amount, $100,000, for their membership interest in CES. In 2008, when Stewart signed the binding letter of intent, he was aware of Smith's licensing agreements. Despite that, he did not assert any claim to Smith's intellectual property, he gave no one any reason to believe that he was entitled to any interest in the intellectual property, nor did he argue that the $100,000 payment he received for his membership interest was in any way inadequate. The record also shows that Smith, unlike Stewart, thereafter separately purchased an equity stake in CES Holdings and negotiated a licensing agreement with CES Holdings for the use of his intellectual property. And, prior to McDonald's involvement in the transaction, Smith acquired an additional 10 percent equity stake in CESP in lieu of payment for funds that he was owed by CES Holdings. There is no evidence in the record that Stewart was legally entitled to share in benefits that accrued to Smith after Stewart had sold his interest in CES to CES Holdings. There is no evidence that Smith or CESP would have agreed to abandon the terms of the binding 2008 agreement, or that there was a viable basis for suing to

5

set it aside. Finally, there is no evidence that Smith would have agreed to renegotiate his deal with CESP to allow Stewart to share in the value of his intellectual property or equity. In short, when he signed his 2010 agreement with CESP, Stewart had very little with which to bargain. That McDonald could have improved on Stewart's deal under these circumstances is pure conjecture.

Given these facts, Stewart has not carried his burden of showing that McDonald likely would have obtained the more favorable agreement that he alleges would have been reached but for McDonald's negligence. See *Szurovy v. Olderman*, 243 Ga. App. at 453 (Because the plaintiff failed to show that her attorney could have negotiated a better agreement, she failed to establish damages and proximate cause. Therefore, as a matter of law, her claims of damage were speculative.). See also *Bryant v. Bryan Cave*, *LLP,* 400 S.W3d 325, 340 (Mo. App. 2013) ("In the context of transactional malpractice, the parties agree, and we hold, that a plaintiff must show that an agreement more preferable to the plaintiff likely would have been consummated but for the negligence of the defendant attorney."). Because Stewart failed to carry his burden of proving this essential element of his claim for legal malpractice, the superior court did not err in granting McDonald's motion for a

6

judgment notwithstanding the verdict. See *Szurovy v. Olderman*, 243 Ga. App. at 453.

For these reasons, I would affirm the superior court's order in its entirety.